In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1349

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

YAIR BERKOWITZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 CR 144 — **Virginia M. Kendall**, *Judge.*

ARGUED SEPTEMBER 25, 2013 — DECIDED OCTOBER 22, 2013

Before WOOD, *Chief Judge*, and FLAUM and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. Yair Berkowitz, together with a host of others, participated in a massive tax fraud scheme with the object of filing false tax returns in the names of over 3,000 unknowing, incarcerated, or deceased people. The scheme netted over $10 million in refund payments from the IRS and

state tax agencies before it was discovered. Yair[1] is the son of the scheme's mastermind, and was a player in the conspiracy by 2003. He was arrested in 2009 and pleaded guilty to one count of wire fraud in 2011. At sentencing, the district court followed the Presentence Report's ("PSR") recommendation and ordered Yair to pay more than $4 million in restitution along with his prison sentence; his restitution liability was joint and several along with his co-defendants. Yair appeals only the amount of the restitution award. We find the award appropriate and affirm the district court.

## I. Background

### A. Facts

The Berkowitz family has had run-ins with the IRS before. Yair's father, Marvin, has a long history of running schemes to defraud state and federal tax authorities.[2] His sons and many other confederates have all been involved at various points and in various capacities. Yair began participating in his father's exploits in 1999 or 2000. Yair acquired the taxpayer information of dead people and used it to help prepare fraudulent tax returns seeking refunds from the IRS. In 2000, he traveled to Miami to get the same type of taxpayer information for federal prisoners.

The scheme prosecuted in *this* case began in 2003 and was broken up in 2009. Fifty-eight different individuals re-

---

[1] Several members of the Berkowitz family were involved in this tax fraud scheme, so we refer to them by their first names.

[2] In 2003, authorities learned of another of Marvin's schemes and he fled to Israel to avoid prosecution. Marvin, Yair's brother Yehuda, and several others were indicted for tax fraud conspiracy in that case.

ceived federal or state refund checks as part of the conspiracy. Participants in the fraud filed more than 3,000 false state and federal tax returns claiming refunds. For his part, Yair received pre-addressed, pre-stamped tax returns from Marvin in Israel. Yair mailed the returns from various U.S. postal codes so as not to arouse IRS suspicion. He controlled accounts where the proceeds were deposited and addresses where checks were mailed. When refund checks issued, Yair traveled to various locations to pick them up from and make cash payments to co-conspirators. He would then mail the checks to Marvin in Israel or otherwise disperse the proceeds.

In 2006, IRS agents interviewed Yair and told him that money he had received from Marvin was obtained by fraud. Yair denied any knowledge of the scheme at this time. He proceeded to ratchet down his direct involvement, as did the dozen or so people he was directly controlling in the collection of the fraudulent returns. But Yair continued to receive money from Marvin and other co-conspirators after 2006 and met with an undercover IRS agent about expanding the fraud in early 2007. The scheme was eventually uncovered, leading to the arrest of Yair (along with many co-conspirators) on August 3, 2009.

**B. Procedural History**

A grand jury returned a fifty-one count indictment on August 4, 2009, charging Yair, Marvin, and nine others with conspiracy to defraud the IRS, wire fraud, and mail fraud. Yair was named in several counts, but pleaded guilty only to Count 51, wire fraud. The conduct alleged in this count was a February 12, 2006 PayPal transfer of $250 from an account in Chicago to a different account in Minneapolis. In the plea

agreement, Yair accepted responsibility for his part in the conspiracy and acknowledged his awareness of his father's fraudulent activities. The district court sentenced Yair to sixty-two months imprisonment, followed by two years of supervised release. Yair challenges neither of these punishments, only the $4,069,091.96 in restitution imposed by the court.

The district court calculated the restitution award using loss figures provided in the PSR. The Government argued that the intended losses from the overall scheme were roughly $65 million and that the actual losses were around $10 million. But the PSR recommended—and the government agreed—to narrow these amounts for Yair. The PSR concluded that when the universe of losses was limited to the dozen or so people that Yair interacted with or directed regularly in the course of the scheme, the intended loss amount was around $19 million and the actual loss $4,069,091.06.

Yair objected to these amounts at sentencing, both for the purposes of calculating his offense level and for fixing the restitution amount. He claimed that the loss amount was not reasonably foreseeable to him, an argument which the district court rejected after weighing the arguments from both sides. The court did not reweigh the evidence when it imposed restitution, however, because the analysis would have been duplicative of the calculations it already performed.

## II. Discussion

Ordinarily, we would review the district court's authority to issue a restitution order de novo and its calculation of restitution amount for abuse of discretion. *United States v. Rand*, 403 F.3d 489, 493 (7th Cir. 2005). But here we engage in the

even more deferential plain-error review. Yair's objections in the district court to the restitution award were nonspecific, but his objections to loss amount (which should mirror the objections to restitution in this case) argued only that the numbers were too large because they included losses not foreseeable to him. His arguments on appeal have a different flavor: Yair now contends that the district court exceeded its statutory authority in awarding restitution because the court charged him for conduct not attributable to him, and because it did not adequately demarcate the contours of the scheme or make the necessary findings of fact connecting Yair's conduct to the loss. Because these arguments are different from the one raised below, we will overturn the district court only if we find error that would deprive Yair of his "substantial rights." *United States v. Randle*, 324 F.3d 550, 555 (7th Cir. 2003).

Federal courts enjoy no inherent power to order restitution—they may only do so where authorized by statute. *Id.* The relevant statute in this case is the Mandatory Victims Restitution Act of 1996 ("MVRA"). 18 U.S.C. § 3663A. As the name suggests, this law requires the district court to award restitution in certain circumstances. Restitution under the MVRA functions as a civil remedy "engraft[ed] … onto a criminal statute," and is therefore calculated by looking solely to the victim's loss and not to the perpetrator's ability to pay. *United States v. Martin*, 195 F.3d 961, 968 (7th Cir. 1999).

The MVRA specifically defines the "victims" to whom restitution must be made:

> [A] person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in

> the case of an offense that involves as an ele-
> ment a scheme, conspiracy, or pattern of crimi-
> nal activity, any person directly harmed by the
> defendant's criminal conduct in the course of
> the scheme, conspiracy, or pattern.

§ 3663A(a)(2). Under certain circumstances, the government can be a victim under the MVRA. *United States v. Sapoznik*, 161 F.3d 1117, 1121 (7th Cir. 1998).

Yair contends that the restitution order is excessive. First, he argues that it charges him for the conduct of others, instead of limiting the award to losses attributable to his specific conduct in furtherance of the scheme. But notable in the statutory language is the expansiveness of restitution authorized for crimes involving a "scheme, conspiracy, or pattern." An individual convicted of such a crime is jointly and severally liable for the losses caused by his or her co-conspirators. *See, e.g.*, *United States v. Dokich*, 614 F.3d 314, 318 (7th Cir. 2010). For this reason, we have squarely rejected the theory that co-conspirator restitution liability under the MVRA is as limited as Yair contends. Moreover, the PSR and the district court limited Yair's liability to losses resulting from his actions and from the actions of those he controlled or worked with regularly. Thus, the restitution order here *is* linked to his specific participation in the scheme, even if we were to accept Yair's limited view of co-conspirator restitution liability.

Yair next argues that the district court's restitution award lacked statutory authority because the judge did not make sufficient factual findings to support it. We disagree. It is true that the court engaged in no protracted discussion of restitution at sentencing and that it adopted the findings of

the PSR. But Yair overlooks the court's earlier discussion of the same figures when it was calculating Yair's offense level.

In compiling a PSR for crimes causing a loss, the probation office calculates both the intended loss and the actual loss caused by the scheme, and offenders are sentenced to imprisonment based on the greater of these amounts.[3] The district court pulled the restitution amount from the PSR's actual loss calculation. There is nothing untoward about doing so, and it was Yair's burden to demonstrate the PSR's unreliability. *United States v. Artley*, 489 F.3d 813, 821 (7th Cir. 2007). Nor is it uncommon for the amount of the restitution award to mirror actual loss. *Dokich*, 614 F.3d at 319–20 (noting that where a defendant intends a large amount of loss he should be sentenced according to that amount but ordered to pay restitution according to the actual loss). The district court did not engage in a lengthy discussion of the restitution order, but it was not required to do so, especially when Yair did not raise any specific objections to the restitution calculation at the time of sentencing. *See United States v. Hassebrock*, 663 F.3d 906, 925 (7th Cir. 2011). We decline Yair's invitation to impose a requirement on district courts to rehash their offense level findings at the restitution phase where no

---

[3] District courts can get into trouble if they rely unquestioningly on these figures, however, because the loss amount for sentencing considers not just the conduct underlying the conviction but "relevant conduct" accompanying it. Calculations for restitution are not so permissive. *Rand*, 403 F.3d at 494. They are rigidly compartmentalized to the actual losses resulting from the conduct of the convicted offenses. *Hughey v. United States*, 495 U.S. 411, 422 (1990). At Yair's sentencing, the district court engaged in no such error; all losses are attributable to the scheme for which Yair pleaded guilty.

new objections are raised and a simple "ditto" explains the award.

### III. Conclusion

We find no error in the district court's calculation of the restitution amount, and therefore AFFIRM Yair's sentence.