In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3718

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AARON MOESER,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 11-CR-127 — **Rudolph T. Randa**, *Judge.*

ARGUED APRIL 14, 2014 — DECIDED JULY 10, 2014

Before WOOD, *Chief Judge*, and POSNER and FLAUM, *Circuit Judges*.

FLAUM, *Circuit Judge*. Aaron Moeser was a loan officer at a bank who, by making material misrepresentations to his employer, enabled an unscrupulous real-estate developer and his associates to obtain a loan the developer couldn't repay. As a result, Moeser joined his co-defendants in pleading guilty to conspiracy to commit bank fraud. Moeser now challenges the district court's decision ordering him jointly

and severally liable for the full amount of restitution owed to the conspiracy's victims. In the alternative, Moeser argues that the court abused its discretion by not apportioning the restitution obligation and giving him a smaller share based on his lesser role and his financial circumstances. We find no merit in either argument, and affirm the court's order.

## I. Background

Moeser was a commercial loan officer at State Financial Bank in Milwaukee, Wisconsin. In September 2004, Moeser prepared a credit approval presentation on behalf of co-conspirator Michael Woyan for Woyan to obtain a $790,000 construction loan from State Financial. Woyan was the head of the People's Action Redevelopment Coalition (PARC), a real-estate developer that planned to build five townhouses at South 5th Place and West Arthur Avenue in Milwaukee ("the 5th and Arthur project"). (There were three other conspirators besides Moeser and Woyan: the project's manager, Joseph Bowles; the architect, Roderick Taylor; and a real estate agent, Leopoldo Balderas. The details of their involvement in the scheme are not important to Moeser's appeal.) Moeser represented to his superiors at the bank that the project's real estate would serve as the construction loan's collateral. He also represented that PARC would be providing the land up front and would thus have a significant equity interest in the project. Senior bank officials preliminarily approved the loan.

Before closing, however, Moeser learned that Woyan did not, in fact, own the land that PARC needed for the project, and moreover, that Woyan did not have the financial means to purchase it. Rather than informing his superiors at State Financial that the representations in PARC's application

were incorrect, Moeser saw an opportunity. He agreed to
lend Woyan the $30,500 that PARC needed to purchase the
land, on the understanding that Woyan would pay Moeser
back—plus $15,000 in interest—using funds from the con-
struction loan's initial disbursement. Moeser did not disclose
to his superiors that the funds for PARC's purchase of the
land came from his own pocket, nor the fact that his person-
al loan was to be repaid with the construction loan. And
bank officials told federal investigators that they would not
have approved PARC's loan if they had known of this ar-
rangement. But they didn't know, so the loan went through
and Moeser got his $45,500 from the initial disbursement of
$111,299.

After this first disbursement, PARC needed to make pe-
riodic "draw requests" to the bank detailing the 5th and Ar-
thur project's progress and costs and asking to draw upon
the remaining loan funds. PARC made fifteen such draw re-
quests; Moeser reviewed each request and forwarded it to
his superiors for final approval. Sometime before the fif-
teenth and final draw in September 2005, Moeser learned
from Woyan that—directly contrary to the representations in
PARC's latest request for more funds—the 5th and Arthur
project was far from complete. He also learned that PARC
was using loan funds for purposes not listed in the draw re-
quests, including the salaries of PARC employees who were
developing an entirely different real-estate project on Mil-
waukee's north side called "Lighting the Way." As a result,
the 5th and Arthur project was facing a major shortfall.
When Woyan asked Moeser what he should do, Moeser told
him to continue paying PARC personnel to develop Lighting
the Way—rather than spending more on construction for 5th
and Arthur—in the hope that PARC could obtain another

bank loan for the new project. Afterward, Moeser forwarded PARC's fifteenth draw request to his superiors without informing them (or anyone else) of its misrepresentations and Woyan's intention to divert the funds.

The 5th and Arthur project was never completed, and PARC defaulted on its loan. Three contractors and a lumber supplier (collectively, "the contractors") were never fully paid for the work they completed or the materials they supplied. State Financial's successor-in-interest, Associated Bank, eventually foreclosed on the property.

In June 2011, Moeser and the four other defendants were indicted on federal charges; Moeser was charged with one count of bank fraud. A superseding indictment added another count of bank fraud against Moeser in addition to charges for corrupt acceptance of money, fraud of a financial institution by an employee, and making false statements during an investigation. In April 2012, Moeser, along with his co-defendants, waived prosecution by indictment and pleaded guilty to an information charging one count of conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344 and 371.

The district court gave Moeser a below-guidelines sentence of two years' probation, which Moeser does not appeal. But the government also asked that Moeser and his co-defendants be jointly and severally liable for $625,544 in restitution: $480,000 to Associated Bank for the amount of PARC's loan that was never repaid (minus what the bank recouped in the foreclosure sale), and the rest to make whole the contractors. The government argued that the bank and the contractors were victims of the defendants' bank fraud

conspiracy and thus entitled to restitution under the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A.

Moeser contested the government's claim that he should be held accountable for the full $625,544 in restitution. He argued that most of the victims' losses were caused not by his actions, but rather by the wrongful conduct of Woyan and his associates. Moeser said that *his* wrongful conduct in the course of the conspiracy was limited to his approving PARC's final draw request in September 2005. His undisclosed personal loan to Woyan, Moeser argued, did not contribute to the bank's loss because the personal loan was unsecured and therefore did not affect the value of the bank's collateral (the land). He also argued that there were sufficient funds budgeted in the 5th and Arthur project's "soft costs"— discretionary funds that were not slated for specific construction costs—to cover the repayment of Moeser's loan plus the $15,000 in interest. Thus, Moeser maintained, he and Woyan never made any material misrepresentations to the bank at the time of the construction loan's origination. And he wasn't the one who failed to pay the contractors. Accordingly, Moeser argued that he should have to pay only $23,048 in restitution—the amount of the construction loan that was wrongfully diverted to non-project expenses as a result of Moeser's deception in the fifteenth draw. In the alternative, Moeser asked the court to exercise its discretion under 18 U.S.C. § 3664(h) to assign him a smaller share of the joint-and-several obligation to reflect his lower level of culpability and his financial circumstances.

The district court postponed its decision about restitution to give the government an opportunity to provide additional evidence of Moeser's involvement in the scheme. After re-

ceiving more briefing from both sides, the district court rejected Moeser's arguments in a written opinion. The court ordered him jointly and severally liable for the full $625,544, to be paid in monthly installments of $200.

## II. Discussion

We review the district court's authority to issue a restitution order de novo and its calculation of the restitution amount for an abuse of discretion. *United States v. Berkowitz*, 732 F.3d 850, 852 (7th Cir. 2013). "A restitution order will be disturbed only if the district court relied upon inappropriate factors when it exercised its discretion or failed to use any discretion at all." *United States v. Sensmeier*, 361 F.3d 982, 988 (7th Cir. 2004).

The MVRA requires district courts to award restitution to identifiable victims of fraud, including bank fraud. 18 U.S.C. §§ 3663A(a)(1), 3663A(c)(1)(A)(ii). The MVRA defines a "victim" as:

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's conduct in the course of the scheme, conspiracy, or pattern.

*Id.* § 3663A(a)(2). Notably, Moeser never argued (to the district court or to our court) that the bank and the contractors do not qualify as victims of PARC's scheme. Instead, he argues that most of the bank's losses, and all of the contractors' losses, were caused by his co-defendants' actions—not his. His wrongful conduct was limited to his involvement in the

fifteenth and final draw on the loan funds. That was the only point at which his actions caused the bank to lose any money, Moeser says, and so that is all the bank is entitled to in restitution from him.

The problem with Moeser's argument is that under our precedent, co-conspirators are held jointly and severally liable for all foreseeable losses within the scope of their conspiracy regardless of whether a specific loss is attributable to a particular conspirator. *See Berkowitz*, 732 F.3d at 853; *United States v. Dokich*, 614 F.3d 314, 318 (7th Cir. 2010); *United States v. Martin*, 195 F.3d 961, 968–69 (7th Cir. 1999). In other words, in this context, the government did not need to prove "a direct causal relationship between the defendant's personal conduct and a victim's loss," because "the MVRA imposes joint liability on *all* defendants for loss caused by others participating in the scheme." *Dokich*, 614 F.3d at 318 (emphasis added).

Moeser acknowledges this rule. Yet he seeks to escape its force. He argues—somewhat incredibly—that the government actually prosecuted multiple conspiracies in connection with the PARC loan, and that he, Moeser, was charged with joining only one: a smaller, more limited conspiracy to make false representations to the bank at the point of the fifteenth draw.

That theory could be plausible in the abstract. But it's clearly not what happened in this case. The criminal information—to which Moeser *pleaded guilty*—charges his knowing involvement in a conspiracy to commit bank fraud beginning in September 2004 (when Moeser made the personal loan to Woyan) and lasting through October 2005 (after he approved the final draw). Lest there be any doubt about the

charged conspiracy's scope, the information describes the scheme's object as "to obtain money to fund the construction of five townhouses at a location in Milwaukee," and alleges that to accomplish this, the conspirators—including Moeser—"sought and obtained a loan from State Financial Bank, through materially false promises and representations." It lists among these "materially false representations" Moeser and Woyan's "failure to disclose that funds for PARC's purchase of the land for the project were obtained from an unsecured $30,500.00 loan from Aaron Moeser and that the loan would be repaid, with interest of $15,000.00, from some of the construction loan funds initially disbursed to PARC." And the information also charges that in furtherance of the conspiracy, Moeser "promoted the loan to senior bank officials, knowing that the project developer, PARC, lacked the funds to purchase the real estate that was pledged as collateral." Thus, Moeser cannot possibly claim that he was only convicted of participating in a limited conspiracy to mislead the bank at the point of the fifteenth draw.

Similarly, Moeser's various theories about why his personal loan to Woyan did not actually defraud the bank—the fact that his personal loan was unsecured, the possibility that the $45,500 PARC used to repay him came from the construction loan's "soft costs" and not its construction budget, etc.—are too little, too late. If Moeser believed that his prosecution lacked a factual or legal basis, he should have pleaded not guilty and raised these arguments at trial. But he did the opposite: he admitted in his plea agreement that his misrepresentations to his superiors were "materially false" and furthered the conspiracy's goal of obtaining the loan. He cannot revisit these admissions under the guise of contesting the restitution amount.

In any event, the government put forth sufficient evidence for the district court to find, by a preponderance of the evidence, that Moeser's conduct in the course of the conspiracy contributed to both the bank's and the contractors' losses. *See* 18 U.S.C. § 3664(e). Moeser's superiors at the bank gave statements to investigators affirming that had they known that PARC did not actually have an equity interest in the project, and that the funds for the land's purchase would be coming from one of the bank's employees (and ultimately from the bank itself), they would not have approved PARC's loan. Moeser's deception was thus essential to the scheme getting off the ground. Moreover, the government's post-sentencing evidence indicated that Moeser knew that PARC was misspending the funds as early as the eighth draw, in May 2005. And this evidence further showed that Moeser not only turned a blind eye to PARC's improper spending, but actually instructed Woyan—when Woyan asked for advice before the final draw—to continue diverting funds to Lighting the Way rather than finish 5th and Arthur. Indeed, Moeser specifically advised Woyan to delay paying outstanding supplier bills.

We therefore find no merit in Moeser's argument that he cannot be held jointly liable under the MVRA for the losses his conspiracy caused its victims. We now turn to his alternative argument: that the district court nonetheless should have exercised its statutory discretion to give Moeser a smaller share of the obligation.

18 U.S.C. § 3664(h) provides that "[i]f the court finds that more than 1 defendant has contributed to the loss of a victim," the court may either "make each defendant liable for payment of the full amount of restitution," or "apportion li-

ability among the defendants to reflect the level of contribu-
tion to the victim's loss and economic circumstances of each
defendant." This determination is left to the district court's
discretion. *Sensmeier*, 361 F.3d at 990. Moeser argues that the
court abused that discretion in his case in three respects.

First, Moeser maintains that the court should have con-
sidered his "disproportionately small causal contribution to
the loss" and held him responsible only for the $23,048
stemming from the fifteenth draw. However, the record
shows that the court did consider Moeser's contributions to
the scheme and found them significant. Rejecting "Moeser's
attempt to distance himself from the actions of his co-
conspirators," the court reiterated its analysis regarding
Moeser's membership in the conspiracy and his actions in
furtherance of it. Having found that Moeser "fully contribut-
ed to the loss of the bank and to the losses of the unpaid
subcontractors," the court decided against letting him off the
hook under § 3664(h). Based on our earlier analysis, we find
no abuse of discretion in that decision.

Second, Moeser argues that the district court should have
given him a lesser share of the $625,544 obligation based on
his "economic circumstances." But Moeser never made a
compelling argument to the court on this front. In his brief
before sentencing, Moeser alluded vaguely to his "financial
challenges" and referred the court to a memorandum pre-
pared by his defense sentencing consultant. He told the
court that the consultant's analysis had established that
"there is no reasonable probability that [he] would ever be
able to pay restitution of hundreds of thousands of dollars."
The consultant's memorandum, in turn, concluded that
"[w]ith a negative net worth of more than $600,000, includ-

ing outstanding loan obligations of almost $3 million and assets of $2.2 million, Aaron has no ability to make restitution." However, the probation office also detailed Moeser's assets—which included 20 investment properties—and his liabilities in the presentence investigation report. And the probation officer recommended that Moeser be sentenced to the full $625,544 at the $200/month rate. Given these conflicting economic assessments—and the fact that Moeser himself did not make a more substantial argument about his "financial challenges" in his brief to the court—the district court did not abuse its discretion by siding with the probation office's assessment over the defense consultant's.

Finally, Moeser argues that the court had a statutory *obligation* to consider his economic circumstances, and that the court's omission of the subject in its written order was "a manifest failure to consider a key statutory factor" and "a *per se* abuse of discretion." For this proposition, Moeser points to 18 U.S.C. § 3664(f)(2), which states:

> Upon determination of the amount of restitution owed to each victim, the court shall … specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of—
>
> (A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;
>
> (B) projected earnings and other income of the defendant; and
>
> (C) any financial obligations of the defendant; including obligations to dependents.

A close evaluation of the text reveals that Moeser misreads the statute. All that § 3664(f)(2) mandates is that the court consider a defendant's economic circumstances in specifying *the manner in which* and *the schedule according to which* restitution is to be paid. This subsection does not obligate the court to consider the defendant's economic circumstances in apportioning liability between co-defendants.

Thus, the district court was only required to take account of Moeser's financial circumstances in setting his payment-by-installment schedule. *See United States v. Day*, 418 F.3d 746, 758–59 (7th Cir. 2005). Moeser never argued that the $200/month schedule was inordinate in light of his financial means. In fact, at oral argument before this court, his attorney did not even know what the payment schedule was. As such, the district court committed no abuse of discretion with respect to § 3664(f)(2), either.

AFFIRMED.