# United States Court of Appeals
## For the First Circuit

No. 22-1327

UNITED STATES OF AMERICA,

Appellee,

v.

CHRISTOPHER OCHOA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Kayatta, Selya, and Gelpí,
Circuit Judges.

Robert C. Andrews, with whom Robert C. Andrews Esquire P.C. was on brief, for appellant.
Brian S. Kleinbord, Assistant United States Attorney, with whom Darcie N. McElwee, United States Attorney, was on brief, for appellee.

January 26, 2023

**SELYA**, **Circuit Judge**.  Defendant-appellant Christopher Ochoa, formerly a practicing attorney and now a convicted fraudster, challenges the district court's restitution order, which held him jointly and severally liable for all sums illicitly obtained by the charged conspiracy.  In the defendant's view, his restitution obligation should have been limited to the portion of the proceeds that went into his own pocket.  Concluding, as we do, that the restitution order falls within the encincture of the district court's discretion, we affirm.

**I**

We briefly rehearse the facts and travel of the case. Because this "appeal follows a guilty plea, 'we glean the relevant facts from the change-of-plea colloquy, the unchallenged portions of the presentence investigation report (PSI Report), and the record of the disposition hearing.'"  United States v. Dávila-González, 595 F.3d 42, 45 (1st Cir. 2010) (quoting United States v. Vargas, 560 F.3d 45, 47 (1st Cir. 2009)).

Beginning in March of 2017, the defendant — a lawyer formerly licensed in the state of Florida — and his co-conspirators orchestrated a scheme designed to defraud investors of millions of dollars.  To execute the scheme, the conspirators (or intermediaries acting to their behoof) contacted prospective

victims and induced them to invest in standby letters of credit.[1] The conspirators pitched the investments as a win-win opportunity.

On the one hand, if the standby letters of credit were issued, the investors would reap huge returns within days or weeks (or so they were promised).[2] On the other hand, if the standby letters of credit were not issued, the investors would not lose a dime (or so they were promised); each investor would simply receive a full refund of his initial investment.

Over the course of a few months, the conspirators convinced at least five people to invest substantial sums of money in the scheme. The defendant played a significant role in bilking the investors. At the direction of two of his co-conspirators (Russell Hearld and Herbert Caswell), he drafted agreements to memorialize the investments, delineate the handling of the investors' funds, and limn the terms of the transactions. Among other things, the agreements represented that investor funds would be held in escrow in the client trust account of the defendant's

---

[1] A standby letter of credit is an agreement through which a financial institution commits to "serve as a guarantor of a certain amount of money in a transaction between" a debtor and a third-party beneficiary. F.D.I.C. v. Plato, 981 F.2d 852, 854 n.3 (5th Cir. 1993); see Mago Int'l v. LHB AG, 833 F.3d 270, 272 (2d Cir. 2016).

[2] For example, one victim who invested $50,000 was promised a $6,200,000 return within ten weeks. Another victim was promised that his $250,000 investment would yield a $10,000,000 return within seven to twelve days.

law firm unless and until the defendant received confirmation that a standby letter of credit had been issued.

Trusting that the drafted agreements said what they meant and meant what they said, each of the five investors wired funds to the defendant to be held in escrow. The defendant, though, did not retain the investors' money in his trust account. Instead, he quickly withdrew some funds for his personal use and disbursed other funds to his co-conspirators.

A few examples help to illustrate the defendant's role. On April 10, 2017, two investors wired a total of $1,500,000 to the defendant's trust account. That same day, the defendant transferred $50,000 from the trust account to his personal account and $50,000 to his business account. In addition, he wired $750,000 to Hearld and $300,000 to Caswell's company. The next day, the defendant transferred another $10,000 to his personal account and transferred $200,000 to Hearld.

Essentially the same pattern was repeated a few weeks later after a different investor wired $1,250,000 to the trust account. Within hours, the defendant transferred $50,000 to his personal account and $10,000 to his business account. He also wired $900,000 to Hearld and $250,000 to Caswell.

The five victims of the fraudulent scheme invested a total of $3,550,000. Individual investments ranged from $50,000 to $1,500,000. After sending their money to the defendant, the

investors were kept in the dark:  no investor was informed by any of the conspirators (including the defendant) that any of his funds had been withdrawn from the trust account.

In point of fact, not a red cent of the investors' money was ever used to obtain standby letters of credit.  Nor was any of that money ever refunded to any investor.

The conspirators bought time by playing on the investors' fears.  For instance, one of the conspirators (Arthur Merson) threatened the investors that they could be precluded from future investment opportunities if they sought the return of their funds.

Patience has its limits and — after some time had passed — one of the victims contacted Florida authorities.  That contact started a chain reaction that brought the matter to the attention of the Federal Bureau of Investigation.  A probe ensued and, on April 25, 2019, a federal grand jury sitting in the District of Maine handed up an indictment charging the defendant and his three co-conspirators with a single count of conspiracy to commit wire fraud.[3]  See 18 U.S.C. §§ 1343, 1349.  Although the defendant

_____

[3] Although none of the defendants resided in Maine, one of the victims was a resident of that state.  Moreover, that victim had wired funds from his in-state bank account to the defendant's trust account.  In a federal criminal case, venue may be laid in any district in which an act in furtherance of a charged conspiracy has taken place.  See 18 U.S.C. § 3237(a); see also United States v. Rutigliano, 790 F.3d 389, 395-97 (2d Cir. 2015).  Consequently, venue in this case was properly laid in the District of Maine.

- 5 -

initially maintained his innocence, he later entered into a plea agreement with the government. On July 22, 2021, he pleaded guilty to the single count charged in the indictment. The district court accepted his plea.

The disposition hearing was held on February 11, 2022, and the court sentenced the defendant to a twenty-nine-month term of immurement, to be followed by a three-year term of supervised release. The court also determined that restitution was "mandatory in the amount of $3,473,701," which was the total amount of the loss caused by the fraudulent scheme.[4] The court deferred, however, in entering a defendant-specific restitution order, see 18 U.S.C. § 3664(d)(5), and directed the parties to furnish further briefing as to whether to apportion restitution or, conversely, to hold the defendant jointly and severally liable for the entire amount of the loss.

In due course, the parties filed their supplemental submissions. The district court reviewed those submissions, and on April 15, 2022, rejected the defendant's entreaty that restitution be limited to $230,000 — the amount that the defendant "personally received from the fraud." United States v. Ochoa, No.

_____

[4] Although the conspirators had obtained $3,550,000 from the victims, the district court found that one of the victims had managed to recoup $76,299. The court, therefore, subtracted that sum from the amount of the loss for purposes of restitution. This overall loss calculation is not challenged on appeal.

19-00077, 2022 WL 1127858, at *3 (D. Me. Apr. 15, 2022). Instead, the court ruled that the defendant should be held jointly and severally liable (along with his co-conspirators) for the full amount of the victims' loss: $3,473,701. See id. at *1, *5. In reaching this result, the court observed that the defendant:

> played a major role in carrying . . . out [the scheme], and its success turned on [his] position as an attorney. Mr. Ochoa induced trusting victims to deposit their money in his law office's trust account, drafted related agreements, and, as the [c]ourt raised during the sentencing hearing, disbursed the victims' funds in direct violation of the agreements that he himself drafted. Moreover, each of the victims wired money to Mr. Ochoa's attorney trust account and Mr. Ochoa disbursed the money to his co-conspirators and to himself. . . . In other words, all of the losses subject to restitution passed through Mr. Ochoa's trust account and none is attributable to activity in which he was not involved.

Id. at *4. The court found it unpersuasive that the defendant had "retained less of the proceeds" than two of his co-conspirators, noting that such an argument "improperly conflate[d] [the defendant's] gain with the victims' losses." Id. at *5. Finally, the court declined the defendant's invitation to apply the reasoning of Paroline v. United States, 572 U.S. 434 (2014), a child pornography case, to the case at hand. See Ochoa, 2022 WL 1127858, at *3.

This timely appeal followed.

This is a rifle-shot appeal: the sole issue on appeal focuses on the district court's decision to hold the defendant jointly and severally liable for the full amount of loss attributable to the fraud scheme. The defendant argues that the court should have limited his restitution obligation to $230,000 — the amount that he personally garnered from the scheme. Relatedly, he argues that holding him liable for the full amount of the sums extracted by the conspiracy would impose a crushing burden and foreclose any prospect of rehabilitation. Because the defendant preserved this claim of error below, our review is for abuse of discretion. See United States v. Carrasquillo-Vilches, 33 F.4th 36, 45 (1st Cir. 2022). Within that framework, we "examin[e] the court's subsidiary factual findings for clear error and its answers to abstract legal questions de novo." United States v. Chiaradio, 684 F.3d 265, 283 (1st Cir. 2012).

The restitution order in this case is grounded upon the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A. The MVRA requires a district court to order a defendant convicted of "an offense against property . . . including any offense committed by fraud or deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii), "to 'make restitution to the victim of the offense,'" United States v. Soto, 799 F.3d 68, 97 (1st Cir. 2015) (quoting 18 U.S.C. § 3663A(a)(1)). What is more, the MVRA requires the court to "order restitution to

- 8 -

each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." United States v. Morán-Calderón, 780 F.3d 50, 51 (1st Cir. 2015) (quoting 18 U.S.C. § 3664(f)(1)(A)). This mandate is easy to apply when a defendant, acting alone, caused all of a victim's losses: in that event, the defendant must be ordered to pay the entire amount of the losses. See United States v. Yalincak, 30 F.4th 115, 121 (2d Cir. 2022).

The situation is more nuanced, however, when — as in this case — more than one miscreant has contributed to the victims' losses. In that event, the MVRA gives the court a choice between two options. See United States v. Salas-Fernández, 620 F.3d 45, 49 (1st Cir. 2010). The court may "apportion liability among defendants according to culpability or capacity to pay, or, in the alternative, [may] make each defendant liable for the full amount of restitution by imposing joint and several liability." United States v. Wall, 349 F.3d 18, 26 (1st Cir. 2003); see 18 U.S.C. § 3664(h). In making this choice, a sentencing court enjoys broad discretion. See Morán-Calderón, 780 F.3d at 52; Salas-Fernández, 620 F.3d at 48-49.

The short of it is that the court may weigh an individual defendant's role in the offense when deciding whether to apportion restitution — but it is generally free to decide the issue either way. See Salas-Fernández, 620 F.3d at 49-50. This freedom of

choice is especially appropriate in conspiracy prosecutions. In that context, "it is well established that defendants can be required to pay restitution for the reasonably foreseeable offenses of their co-conspirators." United States v. Newell, 658 F.3d 1, 32 (1st Cir. 2011); see United States v. Collins, 209 F.3d 1, 4 (1st Cir. 1999). Put another way, under the MVRA, members of a conspiracy may be "held jointly and severally liable for all foreseeable losses within the scope of their conspiracy regardless of whether a specific loss is attributable to a particular conspirator." United States v. Moeser, 758 F.3d 793, 797 (7th Cir. 2014).

With these tenets in mind, it is readily apparent that the district court acted within the encincture of its discretion in entering a restitution order that held the defendant jointly and severally liable to each of the victims for the full amount of the losses suffered by that victim as a result of the scheme. Although not obligated to do so, see Salas-Fernández, 620 F.3d at 48-49, the district court went the extra mile, sought supplemental briefing, and thoroughly considered the degree to which the defendant's actions contributed to the victims' losses. In the district court's judgment, this review reinforced — rather than weakened — the appropriateness of holding the defendant jointly and severally liable for all of the losses.

The court supportably found that the defendant played an instrumental part in the conspiracy: he took advantage of his position as a lawyer to entice investors to entrust him with their money; he drafted the agreements used to facilitate the scheme; he served as a de facto intake valve for the bilked funds; he falsely promised to hold those funds in escrow; and he siphoned off the money and disbursed it — in varying amounts — to himself and to his co-conspirators. And as the district court astutely noted, the defendant's actions created a facade of legitimacy that formed an essential part of the conspiracy.

To be sure, the defendant received a smaller share of the booty than some of his co-conspirators. But his able counsel made that argument to the district court, which rejected it. Nothing in the record fairly suggests that we should second-guess the district court and disturb that quintessential exercise of its discretion.

In an effort to blunt the force of this reasoning, the defendant strives to convince us that a district court's exercise of discretion under the MVRA should be guided by "a standard that place[s] some restriction" on the district court's exercise of that discretion. Although the defendant does not provide much detail as to what the contours of that standard should be, he suggests that this new standard should be derived from the Supreme Court's decision in Paroline, 572 U.S. 434. Based on the logic of

that case, he submits that a district court should be obliged to give weight to a defendant's "conduct" and relative "culpability" in determining whether to apportion restitution. We are not convinced.

Paroline is not a fair congener. There, the defendant pleaded guilty to possessing child pornography, and the Court was faced with "the question of how to determine the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed." Paroline, 572 U.S. at 439. The governing statute was not the MVRA but, rather, 18 U.S.C. § 2259 — a restitution statute specific to offenses enumerated in 18 U.S.C. chapter 110. The Fifth Circuit held that the defendant could be adjudged jointly and severally liable for the full amount of restitution owed to the victim, approximately $3,400,000. See id. at 441-43. That holding was premised in part on the notion that section 2259 "did not limit restitution to losses proximately caused by the defendant" so that "each defendant who possessed the victim's images should be made liable for the victim's entire losses from the trade in her images." Id. at 442-43.

The Supreme Court took a different view, rejecting the Fifth Circuit's conclusion that section 2259 did not "limit[] restitution to those losses proximately caused by the defendant's offense conduct." Id. at 443. The Court held that "a court

- 12 -

applying [section] 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." Id. at 458. The Court described the "causal process" between the defendant's offense and the victim's losses as "atypical," and it was careful to explain that its holding applied only to the "special context" before it — a context that embodied cases in which the defendant was "one of thousands" who contributed to the victim's loss by possessing her images and where, as a result, "it [wa]s impossible to trace a particular amount of [the victim's] losses to the individual defendant." Id. at 449, 458.

The case at hand is at a far remove from Paroline. This case involves a fraud scheme in which there is nothing either atypical or difficult to trace about the causal nexus between the offense conduct and the investors' losses. Nor is there anything about the context that can fairly be described as "special": the defendant took part in a garden-variety fraud scheme in which he and his co-conspirators obtained millions of dollars from five individuals by hoodwinking them into pursuing a bogus investment opportunity. Apples should be compared with apples and — given the starkly different factual settings — we decline to transplant the reasoning of Paroline into the inhospitable soil of this case. See United States v. Kolodesh, 787 F.3d 224, 242-43 (3d Cir. 2015) (declining to extend Paroline to "case involv[ing] straightforward

consideration of moneys obtained by fraud"); see also United States v. Sheets, 814 F.3d 256, 261 (5th Cir. 2016) ("Paroline solely involves the issue of whether restitution may be imposed under the circumstances of that case . . . .").

Three decades ago, we wrote that "[i]n making discretionary judgments, a district court abuses its discretion when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales." United States v. Roberts, 978 F.2d 17, 21 (1st Cir. 1992); accord United States v. Soto-Beníquez, 356 F.3d 1, 30 (1st Cir. 2003); Indep. Oil & Chem. Workers, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988). Here, the district court did not overlook a relevant factor. Nor has the defendant argued that the court gave significant weight to any irrelevant factor. And, finally, the district court's careful handling of the issue belies any suggestion that it made a palpable error of judgment.

We hold that where, as here, a defendant is convicted as a member of a wire-fraud conspiracy, a district court has discretion to order him to reimburse the victims of the scheme, jointly and severally with his co-conspirators, for all reasonably foreseeable losses engendered by the scheme. See Newell, 658 F.3d

at 32; <u>Collins</u>, 209 F.3d at 4.  Such a holding is consistent with the principle that a defendant may be held liable "for all foreseeable losses within the scope of [a] conspiracy."  <u>Moeser</u>, 758 F.3d at 797.  And the court's discretion does not vanish into thin air simply because a particular defendant received a smaller share of the swindled funds than was received by other co-conspirators.  <u>See</u> <u>United States</u> v. <u>Rodriguez</u>, 915 F.3d 532, 536-37 (8th Cir. 2019).

## III

We need go no further.  For the reasons elucidated above, the district court's restitution order is


**<u>Affirmed</u>**.