# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 21, 2024

Lyle W. Cayce
Clerk

———————————

No. 22-20620

———————————

United States of America,

*Plaintiff—Appellee*,

*versus*

Lindell King; Ynedra Diggs,

*Defendants—Appellants*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CR-345-3

———————————————————————

Before Jones, Haynes, and Douglas, *Circuit Judges*.

Edith H. Jones, *Circuit Judge*:

Defendants convicted of healthcare fraud and receiving Medicare kickbacks challenge the district court's admission of recordings involving them and other co-conspirators, the district court's calculation of the improper benefit received for the purposes of their sentence, and the restitution award. Finding no error, we AFFIRM.

## BACKGROUND

Five individuals, including Lindell King and Ynedra Diggs, were charged in an eight-count superseding indictment with conspiracy to defraud

the United States and to pay and receive healthcare kickbacks and violations of the anti-kickback statute.[1] Dr. Paulo Bettega, who was named in the superseding indictment, was a Medicare provider who paid bribes and kickbacks to individuals, including King and Diggs, for referring Medicare beneficiaries to him for treatment that was unnecessary or not even provided. King and Diggs were married and owned and operated group homes for vulnerable individuals who could not care for themselves. Over a period of seven years, King and Diggs received $70,000 in known bribes from checks and additional, unknown amounts of cash. As a result, Bettega's clinic received $537,992.55 from Medicare associated with patients that were residents of the defendants' group homes.

Medicare covers partial hospitalization programs ("PHPs") connected with the treatment of mental illness. These programs are designed to serve patients in lieu of inpatient hospitalization when a patient suffers a flare-up of a preexisting chronic mental health condition and requires services at the intensity and frequency available to patients receiving in-patient psychiatric treatment. PHPs do not serve patients at their mental-health baseline or provide care for long-term conditions like dementia.

At his clinic, Bettega often admitted patients in large groups after providing only a short physical exam for non-psychiatric patients. Often, these patients had no psychiatric conditions and were not suffering from an acute mental-health crisis. Some of them spoke no English. Yet the clinic prescribed a homogenous regime of four group therapy sessions a day in its

---

[1] The indictment charged Dr. Bettega, who remains a fugitive, King, Diggs, and two other group home operators: Colin Wilson and Timothy Haynes. Garcia, who died prior to King and Diggs's trial, was charged in a prior indictment.

No. 22-20620

PHP program, which patients often skipped or could not understand or participate in.

Following a four-day jury trial, King and Diggs were convicted of conspiracy as well as individual counts for soliciting or receiving kickbacks. As part of the evidence, the Government introduced recordings made by Ray Garcia, a confidential informant who was paid more than $13,000 for his cooperation with the government. The district court denied the defendants' pre-trial motion to exclude the recordings, reasoning that they did not contain testimonial statements and Bettega was a coconspirator acting in furtherance of the conspiracy. At trial, King and Diggs did not specifically renew the prior objection, but they asked for and received limiting instructions to the jury in accordance with the district court's ruling on the motion in limine.

The district court sentenced King to 60 months in prison and Diggs to 70 months. King and Diggs's sentences were based on a finding of $537,992.55 of improper benefit, which yielded a 12-level adjustment under the Sentencing Guidelines for each defendant. U.S.S.G. § 2B1.1(b)(1) (loss attributable was more than $250,000 but less than $550,000). Their objections to the improper benefit amount reflected in the Pre-Sentencing Reports ("PSRs") and at sentencing were overruled. The court also held King and Diggs jointly and severally liable for $537,992.55 in restitution. Both defendants have appealed.

## II. DISCUSSION

This court reviews preserved Confrontation Clause claims de novo, subject to a harmless error analysis. *United States v. Noria*, 945 F.3d 847, 853 (5th Cir. 2019). Evidentiary rulings preserved at trial are reviewed for abuse of discretion, subject to harmless error. *United States v. Sanjar*, 876 F.3d 725, 738 (5th Cir. 2017).

No. 22-20620

For sentencing, this court reviews the district court's loss calculations for clear error and the district court's methodology de novo. *United States v. Harris*, 821 F.3d 589, 601 (5th Cir. 2016). Restitution orders are reviewed de novo for legality, and the amounts for abuse of discretion. *United States v. Villalobos*, 879 F.3d 169, 171 (5th Cir. 2018).

The Mandatory Victims Restitution Act ("MVRA") states that "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government" and that "[t]he burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires." 18 U.S.C. § 3664(e). This court "has interpreted these two statutory sentences to establish a burden-shifting framework for loss-amount calculations. The Government first must carry its burden of demonstrating the actual loss to one or more victims by a preponderance of the evidence. Then the defendant can rebut the Government's evidence." *United States v. Williams*, 993 F.3d 976, 980-81 (5th Cir. 2021). When the exact amount of actual loss is not clear, the district court is permitted to make reasonable estimates supported by the record. *See, e.g.*, *United States v. Mazkouri*, 945 F.3d 293, 304 (5th Cir. 2019); *United States v. Comstock*, 974 F.3d 551, 559 (5th Cir. 2020). Actual loss for restitution purposes is offset by the amount of the legitimate services provided to the patients in healthcare fraud cases. *See United States v. Sharma*, 703 F.3d 318, 324 (5th Cir. 2012); *United States v. Ricard*, 922 F.3d 639, 658 (5th Cir. 2019).

We address in turn the defendants' arguments surrounding (a) evidence submitted in recordings, (b) the sentencing calculations of improper loss, and (c) the restitution awards.

4

### A. The recordings

The Confrontation Clause bars the admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). A statement is "testimonial" if its "primary purpose … is to establish or prove past events potentially relevant to later criminal prosecution." *United States v. Duron-Caldera*, 737 F.3d 988, 992-93 (5th Cir. 2013) (internal quotation marks and citation omitted).

We reject the defendants' Confrontation Clause arguments. First, any confrontations between Garcia (the informant who worked at the clinic) and Dr. Bettega involved statements of co-conspirators—making them non-testimonial and thus not prohibited by the Confrontation Clause. *United States v. Ayelotan*, 917 F.3d 394, 403 (5th Cir. 2019). Second, the conversations between Garcia and King or Diggs are also not testimonial. In *United States v. Cheramie*, 51 F.3d 538, 540-41 (5th Cir. 1995), statements by an unavailable witness on a recording and a transcript of a conversation between the unavailable witness and the defendant did not violate the Confrontation Clause because the witness's statements were not offered to prove the truth of the matter asserted therein, but to provide context to the defendant's recorded statements. *Cheramie* held that the evidence did not violate the Confrontation Clause because they were part of a reciprocal and integrated conversation with the defendant and the Government sufficiently proved the reliability of the recording. *Id.* This case is indistinguishable from *Cheramie*. King and Diggs do not dispute that statements of Garcia and Bettega on the recordings were part of integrated and reciprocal conversations with them. Accordingly, they provided context to King's and Diggs's statements, were not admitted to prove the truth of the matters asserted, and did not violate the Confrontation Clause. *Id.* at 541.

Nor did the district court erroneously admit the recordings as impermissible hearsay. Hearsay is a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Federal Rule of Evidence 802 provides that hearsay generally is not admissible at trial. However, a defendant's out-of-court statements, when offered by the Government, "are those of a party opponent and thus not hearsay." *Sanjar*, 876 F.3d at 739; *see* Fed. R. Evid. 801(d)(2). This court has recognized that some statements made during recorded conversations are admissible as "reciprocal and integrated utterance(s)" between a defendant and another party, for the purpose of creating context and making them "intelligible to the jury and recognizable as admissions." *United States v. Gutierrez-Chavez*, 842 F.2d 77, 81 (5th Cir. 1988) (internal quotation marks and citations omitted); *see also United States v. Jones*, 873 F.3d 482, 496 (5th Cir. 2017). Thus, Rule 801(d)(2) applies to the recorded statements of both Garcia and Bettega.

We also reject King's assertion that the recorded conversations between Garcia and Bettega cannot be admitted under the "context" portion of Rule 801(d)(2). Rule 801(d)(2)'s party-opponent rule includes statements "made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). This portion of the Rule applies to Bettega's statements as a co-conspirator, and the evidence was sufficient to establish a conspiracy between King and Bettega.

Last, we reject the argument that admitting the conversations was error under Federal Rule of Evidence 403 because the resulting prejudice outweighed its probative value. "Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403." *United States v. Pace*, 10 F.3d 1106, 1115-16 (5th Cir. 1993) (citation omitted). As the trial

court concluded, the recorded conversations' prejudice did not substantially outweigh their probative value.

### *B. Loss Amount for Sentencing*

Under the Sentencing Guidelines, defendants convicted of healthcare kickback offenses start with a base offense level of eight, U.S.S.G. § 2B4.1(a), which is moved upward according to the loss-amount table, U.S.S.G.§ 2B1.1. Applying the table, the Probation Office increased the defendants' levels by 12 points for losses it estimated at over $500,000, according to the "benefit" conferred on Bettega's clinic and loss to Medicare.

Generally, the government must show by preponderance of the evidence the amount of loss attributable to fraudulent conduct. *See United States v. Nelson*, 732 F.3d 504, 521 (5th Cir. 2013). "The loss amount 'need not be determined with precision,'" *United States v. Reasor*, 541 F.3d 366, 369 (5th Cir. 2008), nor "absolute certainty," *United States v. Goss*, 549 F.3d 1013, 1019 (5th Cir. 2008). A district court may rely upon information in the PSR in making its loss-amount estimate, so long as that "information bears some indicia of reliability." *United States v. Simpson*, 741 F.3d 539, 557 (5th Cir. 2014). A defendant who challenges a PSR's loss estimate "bears the burden of presenting rebuttable evidence to demonstrate that the information in the PSR is inaccurate or materially untrue." *United States v. Danach,* 815 F.3d 228, 238 (5th Cir. 2016) (quoting *Simpson*, 741 F.3d at 557).

The government here proved by preponderance of the evidence that Dr. Bettega's entire operation was fraudulent, and that no deference should be afforded to the clinic's medical records. The government's evidence showed that the pervasive scheme provided no legitimate medical care to patients residing at King's and Diggs's group homes. Reina Gonzalez, Dr. Bettega's assistant, testified at trial that the clinic billed Medicare for mental healthcare for patients with no mental health conditions and routinely

falsified medical records. *See Sanjar*, 876 F.3d at 748 (no deference to restitution testimony that assumed the accuracy of underlying records, even though "substantial evidence showed they were, in fact, falsified."). Reina Gonzalez also described how Dr. Bettega admitted patients to the program after quick evaluations for non-psychiatric symptoms and admitted large groups of patients from King's and Diggs's group homes at the same time.

King and Diggs, in contrast, failed to offer rebuttal evidence of *any* legitimate medical expenses billed to Medicare that should be set off from the $537,992.55 paid to Bettega for "treatment" provided to the residents of their group homes. This distinguishes their case from *Ricard*, where the defendant did offer testimony to show patients were receiving legitimate treatment. 922 F.3d at 659. Moreover, neither defendant offers a specific dollar amount, or even a rough estimate, of how much of the clinic's care may legitimately be offset against the improper benefit calculation. Therefore, the amount paid by Medicare to the clinic stands as the only amount available to the district court for assessing improper benefit—a calculation that need not be determined with "absolute certainty." *Goss*, 549 F.3d at 1019.

King and Diggs cite the medical charts of clinic patients who were also residents of their group homes. But apart from the charts, no evidence supports that these patients actually had the medical conditions described in the records or that their prescriptions—which may have been filled—were actually medically necessary. The district court was not required to credit the defendants' self-serving arguments, which assume that the treatment reflected in those records was "medically necessary and met the insurer's reimbursement standards." *Sharma*, 703 F.3d 326.

Similarly, none of the statements by Major Marlowe, Reina Gonzalez, or Timothy Haynes discuss specific medical services provided to specific

patients on specific occasions that qualified as "legitimate" and should be set off from the amounts paid by Medicare. All of the testimony pointed to by King and Diggs is qualified, provided at an extremely high level of generality, and not indicative that any of the patients were actually being provided legitimate and reasonably necessary medical care. Nor is background noise in one of the recordings between unnamed individuals discussing medical tests, medications, or patient treatments sufficient to show that the clinic legitimately provided medical care to patients from King's and Diggs's group homes.

Moreover, any error by the district court in calculating the legitimate care was harmless for the purposes of the improper benefit analysis. Under Section 2B1.1(b)(1), the district court would have had to apply a 12-point enhancement to any loss greater than $250,000. To receive relief on this issue, they would have to show that a majority of the $537,992.85 Medicare paid Bettega for claims related to the residents of the defendants' group homes was legitimate. But none of the isolated instances of allegedly legitimate medical care provided to the residents could yield an offset that high given the large number of patients at issue and significant amounts of PHP treatment that Medicare was billed for. *See United States v. Hamilton*, 37 F.4th 246, 266 (5th Cir. 2022) (loss-amount error harmless where same 20-level enhancement would have applied).

### *C. Restitution award*

The analysis of the restitution award largely tracks that for improper benefit. The Government introduced evidence that Medicare paid Bettega's clinic $537,992.55 for claims related to the residents of the defendants' group homes and demonstrated that the medical services were fraudulent. King and Diggs failed to show that any of the billed medical care was legitimate,

and thus did not show that the total billed to Medicare was subject to an offset. Their case is amply distinguishable from *Ricard*.

Further, King's and Diggs's argument that their maximum restitution is limited to the $70,000 they received in kickbacks is legally erroneous. King and Diggs were convicted for conspiring to solicit and receive kickbacks and to defraud the United States through the Medicare program, in violation of 18 U.S.C. § 371. Thus, their restitution applies to any losses that Medicare "directly" suffered from their agreement to accept kickbacks and enable Bettega's Medicare fraud. *See United States v. Mathew*, 916 F.3d 510, 516 (5th Cir. 2019). The out-of-circuit cases cited by King in support of this argument are inapposite. *See United States v. Fennell*, 925 F.3d 358, 362 (7th Cir. 2019) (expressing no opinion about equating kickback amounts with victim's actual loss); *United States v. Vaghela*, 169 F.3d 729, 736 (11th Cir. 1999) (relying on the kickback amount because the government failed to prove that the relevant medical services were illegitimate).

That Bettega, rather than King or Diggs, received the primary benefit from fraudulent Medicare payments is irrelevant for assessing restitution. "Under the MVRA, members of a conspiracy may be 'held jointly and severally liable for all foreseeable losses within the scope of their conspiracy regardless of whether a specific loss is attributable to a particular conspirator.'" *United States v. Ochoa*, 58 F.4th 556, 561 (1st Cir. 2023) (quoting *United States v. Moeser*, 758 F.3d 793, 797 (7th Cir. 2014)). This is also consistent with the statutory text, under which a district court, on holding that more than one defendant caused the victim's loss, "may make each defendant liable for payment of the full amount of restitution *or* may apportion liability among the defendants to reflect the contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h) (emphasis added). "[T]he MVRA imposes joint liability on *all* defendants for loss caused by others participating in the scheme." *United*

*States v. Dokich*, 614 F.3d 314, 318 (7th Cir. 2010) (emphasis added). *See also United States v. Goodrich*, 12 F.4th 219, 228 (2d Cir. 2021) (holding that the MVRA "does not limit restitution to losses caused by the actions of that defendant during the conspiracy, but also embraces losses flowing from the reasonably foreseeable actions of that defendant's co-conspirators.") (citation and quotation marks omitted). Consequently, though this is not required, "if more than one defendant contributes to the loss of a victim, the court may make each defendant liable for the payment of the full amount of restitution." *United States v. Verdeza*, 69 F.4th 780, 796 (11th Cir. 2023).

The district court did not abuse its discretion in imposing restitution on each defendant jointly and severally for the full amount of the Medicare fraud.

For the foregoing, the judgment and sentence of the district court are AFFIRMED.