**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Chol Ku KANG, Defendant–Appellant.**

**No. 90–2498.**

United States Court of Appeals,
Fifth Circuit.

June 13, 1991.

Roland E. Dahlin, II, Federal Public Defender, Thomas S. Berg, Dola J. Young, Asst. Federal Public Defenders, Houston, Tex., for defendant-appellant.

Paula C. Offenhauser, Asst. U.S. Atty., Henry K. Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before REAVLEY, HIGGINBOTHAM, and DUHÉ, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Chol Ku Kang appeals his conviction of four counts of bribery of an officer of the Internal Revenue Service, 18 U.S.C. §§ 2, 201(b)(1)(A), and of one count of conspiracy, 18 U.S.C. §§ 201(b)(1)(A), 371. Kang challenges the admission of certain out-of-court statements and of evidence of his flight. He also urges that the district court should have dismissed the indictment for outrageous government conduct. We reverse and remand for a new trial.

I.

In January 1986 the Houston office of the Internal Security Division of the Internal Revenue Service began to investigate possible employment tax violations by various topless lounges and nude modeling studios in the Houston–Galveston area. Investigators targeted approximately thirty businesses, all suspected of filing inaccurate employment tax returns. Agent John Patrick Rush, a criminal tax investigator, supervised the project. Revenue Agent Frank Archie assisted.

The Lip–Stix Lounge in Galveston was one of the establishments targeted for investigation. Chol Ku Kang was the lounge's owner. Kang's girlfriend, Sun Ruiz, and his brothers, Myong Ku Kang and Sang Ku Kang, were also involved in sexually oriented businesses under investigation. Ruiz owned Sugar's Lounge, a topless bar situated across the street from the Lip–Stix Lounge; Myong Ku Kang was the owner of Yokohoma Modeling Studio in Houston.

By July 22, 1986, the day Kang was first contacted by Agent Archie, Archie had already visited Kang's brother once, and on this same day he paid a visit to Sun Ruiz. Agent Archie, wired with a hidden recorder and electronic surveillance equipment, went to the Lip–Stix Lounge and met with Kang for approximately one hour. During this first meeting Agent Archie explained that he worked with the IRS returns compliance program and that the purpose of his visit was to determine whether Kang had properly classified certain personnel as contract laborers, as opposed to employees. If claimed contract laborers were actually employees, Kang would owe additional taxes. Agent Archie focused Kang's attention on four particular individuals, all of whom Kang insisted were not employees.

Agent Archie returned to the Lip–Stix Lounge on August 6, 1986. He explained to Kang that he had calculated Kang's tax liability based on the presumption that each of the four individuals identified earlier were in fact employees. After reviewing with Kang the extent of his tax liability, which exceeded $14,000.00, Agent Archie explained IRS procedures regarding the taxpayer's right of appeal. When Kang expressed his interest in a "discount," Agent Archie made it clear that he could not *legally* reduce or dismiss Kang's tax liability.

On August 11, 1986 Agent Archie delivered Kang's modified tax returns to him at the Lip–Stix Lounge. Kang offered to pay for Agent Archie's meal at a nearby restaurant. At the restaurant Agent Archie advised Kang that in the event of his noncompliance the IRS had authority to seize and sell his assets. At this point Kang offered a bribe to Agent Archie in exchange for having his case dismissed. Kang paid Agent Archie $1,457.00, representing ten percent of his total tax liability. Agent Archie accepted the bribe but instructed Kang not to tell anyone about their agreement. Agent Archie also asked Kang to deliver to Sun Ruiz the modified return that he had prepared for her.

On Ruiz's behalf, Kang later contacted Agent Archie to schedule another meeting. During this meeting, which took place on August 22, 1986, Ruiz also asked for a "discount." She paid Agent Archie $600.00 to relieve her tax liability. Agent Archie asked Kang if he knew of others who would be interested in making similar transactions. Later that same day Kang arranged meetings between Agent Archie and both of his brothers, each of whom paid Archie to cancel their tax liabilities.

On March 3, 1989 Kang was charged in an indictment with one count of conspiracy to bribe an IRS officer and four counts of bribery and aiding and abetting bribery. 18 U.S.C. §§ 2, 201(b)(1)(A), 371. A previous indictment, returned in October 1988, raised similar charges against Sun Ruiz, Myong Ku Kang, and Sang Ku Kang. Chol Ku Kang was tried before a jury and convicted on each count.

Before the indictment, in February 1989, Kang sold his business and moved to California, where he took an assumed name. Kang was arrested in California by federal officers in July 1989. When arrested, Kang denied his true identity and presented officers with false identification. Asked why he had moved to California, Kang responded, "Statue of liberty." He later explained that he fled to avoid indictment until the passing of the statute of limitations.

## II.

### A.

Kang stipulated that he knowingly and intentionally bribed Agent Archie. Thus, Kang's criminal intent at the time of the bribe was not in issue, but because Kang urged entrapment, he raised the question whether he had been predisposed to make the bribe.

■ "Entrapment, as a doctrine, asks ... what was the defendant's mind *before* he did the charged acts." *United States v. Henry*, 749 F.2d 203, 213 (5th Cir.1984) (en banc) (emphasis in original). The focus is on the defendant's *predisposition* to commit the crime, absent inducement. The critical determination is whether the criminal intent or design originated with the defendant or with government agents. *See United States v. Nations*, 764 F.2d 1073, 1079 (5th Cir.1985).

■ A defendant, relying upon the defense of entrapment must first present evidence that government conduct "created a substantial risk that an offense would be committed by a person other than one ready to commit it." *United States v. Johnson*, 872 F.2d 612, 620 (5th Cir.), *reh'g*

*denied*, 880 F.2d 413 (1989). This showing involves two elements: (1) that the defendant lacked predisposition to commit the crime, and (2) that governmental involvement and inducement amounted to more than just an opportunity to commit the crime. *Nations*, 764 F.2d at 1979 (quoting *United States v. Andrew*, 666 F.2d 915, 922 (5th Cir.1982)). If the defendant succeeds in meeting his burden, the government must prove beyond a reasonable doubt that the defendant was predisposed to commit the offense.

### B.

■ Kang's first claim of error concerns the admission of out-of-court statements regarding alleged violations by Kang of Texas Alcoholic Beverage Commission regulations. At trial the government offered into evidence several excerpts from a tape-recorded conversation between Agent Archie and Kang at the Lip–Stix Lounge on August 11, 1986. At one point during this conversation Agent Archie accused Kang of charging him $10.00 for a bar drink, while recording only $2.50 on his books. Agent Archie also threatened to disclose this information to the Texas Alcoholic Beverage Commission.

Just before the allegation and threat, Agent Archie explained to Kang that where a taxpayer fails to provide the IRS with sufficient or credible information, IRS agents have the authority to determine a taxpayer's liability based on their own assessments. Kang responded that the taxpayer certainly is entitled to dispute the accuracy of the IRS's information in such instances. Agent Archie then stated:

... not when we, when I have gone in there and paid $10.00 for a glass of wine and they are charging $2.50. I should take ... the Alcoholic Beverage Commission would love to know that.... I go down there and they put me on the witness stand. Do I solemnly tell the truth and nothing but the truth so help me God. When two of my friends came here and they put them on the witness stand and they ... charged them $10 for a

little glass of wine. Sure TABC would love to know that.... And they only report on their books $2.50.

Kang did not object to the admission of this conversation. Indeed, he relied on Agent Archie's recorded statements in support of his entrapment defense—as evidence that Agent Archie was attempting to induce Kang to offer a bribe. On cross-examination Agent Archie admitted that he had lied to Kang; he had never actually purchased a $10.00 bar drink at the Lip–Stix Lounge. The prosecution on redirect, hoping to dispel the implication that Archie was attempting to extort a bribe from Kang, questioned Agent Archie as to the basis for his comments to Kang. Kang objected to Agent Archie's references to the sources of his information, urging that such out-of-court declarations are hearsay. The district judge first sustained the objection, but after hearing from the prosecution changed her mind.

The prosecution argued that defense counsel "opened the door" to this issue by eliciting from Agent Archie that he had lied to Kang about purchasing a $10.00 drink. According to the prosecution, eliciting that Archie lied to the defendant put in issue the manner of Agent Archie's investigation and the basis of his allegations against Kang. The prosecution contended that because the jury might infer that Archie threatened Kang as part of his effort to coerce a bribe, it should be allowed to show Archie's actual state of mind at the time—that Archie had a legitimate investigatory reason for mentioning this issue and that he had a reasonable, good faith basis for believing that Kang was overpricing drinks. Apparently persuaded by the prosecution's argument, the court allowed Agent Archie to testify that his information concerning the drink prices at the Lip–Stix Lounge and possible TABC violations came from IRS internal intelligence reports and from his superior, Agent Rush.[1]

In closing arguments, the prosecution came back to the evidence that Kang had violated TABC regulations. This time, however, the government was not so modest in its use of the evidence. The prosecutor argued to the jury that this evidence was proof that Kang was predisposed to "cheat on his taxes."[2] Kang objected to this line of argument on the basis that there was no record evidence that he had ever overpriced drinks or underreported drink revenues. The district court overruled the objection. The court then denied

---

1. Agent Archie's actual testimony was as follows:

Q: (Prosecutor) Prior to making contact with the defendant, you had been provided with a considerable amount of intelligence, is that correct?
A: That is correct.
Q: And among the information that you were provided with, you were informed what price the defendant was charging for alcoholic beverages?
    \*    \*    \*    \*    \*    \*
Q: Did some of the intelligence that you had received concern the prices that the defendant charged for a drink?
A: Yes, I did receive information about—
Q: Without going into detail, just answer the question specifically, did some evidence or intelligence that you received pertain to the drink prices that the defendant was charging?
A: Yes, it did.
Q: And who did you receive the information from?
A: From IRS Internal Security Division Inspector John Rush.

2. The following is an excerpt from the prosecutor's closing argument:

I will direct your attention to a set of circumstances surrounding one of the conversations where they discussed the prospect of Frank Archie going to TABC, Texas Alcoholic Beverage Commission with a report that the defendant was understating the price that he was selling for his drinks. Now what's the significance of that? You know what flows from the cost of drinks is the revenues generated by the business, that the revenues generated by the business determine what tax is going to be paid. That if an individual is going to look at his tax obligation by reducing the revenues that he reports, then he's a tax cheat, that he's trying to avoid or evade taxes. That happened, the reporting occurred, not after Frank Archie, but long before Frank Archie. Now, if in fact Chol Ku Kang wasn't fearful that something unlawful, something improper that he was doing would be reported to authorities, then why would that have any impact on it? The reason it had impact on it is because he knew he was doing wrong. Now, what's the significance within the context of this case? The significance is that the defendant was predisposed to cheat on his taxes.

Kang's motion for mistrial after hearing from the prosecutor, who insisted that his argument was a reasonable inference from the facts. The court later denied Kang's motion for new trial as well. Though the court's order correctly observed our holding in *United States v. Webster*, 649 F.2d 346, 350 (5th Cir.1981) (en banc), that hearsay evidence *is not admissible* to prove the predisposition of a defendant, the court found that the prosecution's evidence of the $10.00 drink was not offered for that purpose.

According to the government, Agent Archie's reference to information he obtained from Agent Rush and from IRS intelligence reports was not hearsay because this testimony was not offered to prove the truth of such information. Rather, the evidence was offered to show Agent Archie's state of mind at the time that he initiated the conversation with Kang regarding drink prices and compliance with TABC regulations. The government contends that it was entitled to show that Agent Archie, in broaching this matter with Kang, was not attempting to extort a bribe; he was subtly conveying to Kang that he understood that Kang was conducting business in an unlawful manner, hoping that this might make Kang more relaxed in his presence—or as Agent Archie put it, make him more "approachable" to Kang. According to the government, it was entitled to establish Agent Archie's reason for going into the matter, and the basis for his information, because otherwise the jury would be left with the impression that Agent Archie was threatening Kang with unsubstantiated accusations as a way of extorting a bribe. With this, there is little quarrel because the *fact* of the out-of-court declaration is relevant. However, this is *not* the use the government made of the evidence.

The prosecution may not do indirectly what we hold it cannot do directly. Therefore, except in the limited circumstance described [below], the hearsay that is inadmissible to prove predisposition may not be admitted on the assertion that it is offered as direct evidence that the governmental actions at issue were reasonable and done in good faith or for proper motives. Although there were some doubts prior to 1976, the Supreme Court's decision in *United States v. Russell*, 411 U.S. 423 [93 S.Ct. 1637, 36 L.Ed.2d 366] (1973), makes it clear that the crucial issue in entrapment cases is whether the defendant was predisposed to commit the crime. The agent's good faith, motive or reasonableness is only of secondary significance, if relevant at all. *Out-of-court statements offered for these purposes will almost always have little probative value, and the prejudicial effect of the evidence is likely to be great because the jury might consider it as evidence of predisposition or bad character.*

. . . . .

As we have already pointed out, in the run-of-the-mill entrapment case where no special circumstances are present, evidence of good faith, motive or reasonableness of the government is, at least since the *Russell* decision, of little if any significance and the prejudice will outweigh any probative value. Rule 403 of the Federal Rules of Evidence provides that evidence, although relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." *In almost all cases the scale will fall on the side of prejudice.* In rare circumstances governmental good faith, motive, and reasonableness may take on significance beyond the scope of entrapment *vel non*. For example the defendant might assert that a particular agent participating in the government's activities was out to get him only because the agent harbored some personal prejudice against him. It would then be appropriate to allow the government to prove that the agent acted with proper motive in pursuing the defendant.

*Id.* at 351 (emphasis added).

*Webster* speaks to the reality of the trial scene, refusing to accept the incantation of "not offered for its truth" when all know that a limiting instruction will often arrive too late with too little. The limited excep-

tions to this rule involve grounds for admissibility unrelated to entrapment and this case. The government offered this evidence to controvert the inference of official inducement. There is a powerful argument that under *Webster* such evidence is inadmissible and the district court erred in permitting the prosecution to elicit from Agent Archie that he based his information on statements made by Agent Rush and on IRS intelligence reports. Had the government stopped there, we would be left with a debatable question of harmless error. But, it did not.

Over Kang's explicit objection, the prosecutor in his closing argument returned to Archie's testimony. This time he used the evidence for its truth and aimed it at the critical issue of predisposition. He urged the jury to conclude that this was evidence of predisposition to cheat on his taxes, an argument that went to the jury with the added bite of an overruled objection. We understand the temptation for the prosecutor; it is difficult to lay aside so potent a weapon. But we do not say this to forgive the error. To the contrary. That the prosecutor succumbed is a testament to the force of the poison he reached for. He thought it was effective and needed to make his case, or he would not have made the argument. Such lack of discipline wins battles and loses wars. It is a losing argument.

This case has much in common with *United States v. Hernandez,* 750 F.2d 1256 (5th Cir.1985). In *Hernandez* we reversed the defendant's controlled substances convictions after finding that the district court had permitted the prosecution to elicit hearsay on the issue of the investigating Drug Enforcement Administration officer's state of mind,[3] and had allowed the prosecuting attorney in closing argument to refer back to this testimony as evidence of Hernandez's guilt.[4] As to the admissibility of the officer's (Saulnier's) testimony to show his state of mind, we stated,

The government's argument that this testimony was not hearsay and was relevant to show Saulnier's state of mind lacks merit. Saulnier's state of mind was not at issue. The testimony was, therefore, clearly hearsay. The referral was a "statement" other than one made by Saulnier (the declarant) while testifying at trial, offered to prove the truth of the matter asserted (that Hernandez was a drug smuggler). The government's protestation that the evidence was not elicited to prove Hernandez was a drug smuggler, but merely to explain the motivation behind DEA's investigation is unconvincing from both a common sense perspective, and from the government's subsequent use of that testimony.

.    .    .    .    .

[E]ven if, by some stretch of the imagination, Saulnier's testimony were found to be relevant ... its minimal probative value is substantially outweighed by the risk of unfair prejudice, confusion of the issues, and misleading the jury, and the testimony was therefore inadmissible....

*Id.* at 1257–58. In *Hernandez* we found that the prosecutor's attempt to exploit testimony concerning out-of-court statements in closing argument by linking it explicitly to impermissible propositions only "aggravated the prejudice," thereby denying the defendant "the fair trial to which he is entitled." *Id.* at 1259.

The district court abused its discretion by allowing the prosecuting attorney to argue to the jury that Agent Archie's testimony was evidence that Kang was predisposed to cheat on his taxes. The error was not harmless.

### C.

■ Kang's second point of error concerns the district court's admission of evidence of Kang's post-offense flight and subsequent apprehension in California. As

---

**3.** He testified that the defendant was brought to the DEA's attention when they received "a referral by the U.S. Customs as Hernandez being a drug smuggler." *Id.* at 1257.

**4.** The prosecutor argued that this evidence established that Hernandez was "a known cocaine trafficker." *Id.* at 1258.

we explained, Kang stipulated at trial that he willfully committed the bribery offense. Therefore, the only genuine trial issue was entrapment, which involves two issues: the government's inducement and Kang's predisposition. Nevertheless, the prosecution was permitted to put on evidence of Kang's flight to California, his use of an assumed name, his refusal to admit his true identity to his arresting officers, and his statement that he left Texas to avoid the "statue of liberty," which the police later clarified to mean statute of limitations.

Kang contends that notwithstanding the court's limiting instruction,[5] the prosecution's evidence of flight was unfairly prejudicial and should have been excluded under Federal Rule of Evidence 403, given that this evidence was at best relevant to Kang's criminal purpose in the bribery, which was not at issue. The district court overruled Kang's Rule 403 objection at trial. Relying on *United States v. Williams*, 775 F.2d 1295, 1300 (5th Cir.1985), *cert. denied*, 475 U.S. 1089, 106 S.Ct. 1477, 89 L.Ed.2d 732 (1986), the court found that the evidence of Kang's flight was probative on the issue of guilt. The court further concluded that the evidence that Kang lied to federal officials about his identity was probative of his untruthfulness, an element of bribery, and was not unduly prejudicial given the prosecution's other proof of Kang's untruthfulness, namely, the tape recorded conversations with Agent Archie. Finally, the court found that whatever prejudice might result from this admission would be cured by the limiting instruction.

It is true "that evidence of an accused's flight is generally admissible as tending to establish his guilt." *Id.* at 1300. But our question is whether this evidence was probative after Kang's concession that he did willfully bribe.

Evidence of flight may be likened to extrinsic evidence of a defendant's prior criminal acts.

Probity in this context is not an absolute; its value must be determined with regard to the extent to which the defendant's unlawful intent is established by other evidence, stipulation or inference. It is the incremental probity of the evidence that is to be balanced against its potential for undue prejudice. Thus, if the Government has a strong case on the intent issue, the extrinsic offense may add little and consequently will be excluded more readily. *If the defendant's intent is not contested, then the incremental probative value of the extrinsic offense is inconsequential when compared to its prejudice; therefore in this circumstance the evidence is uniformly excluded.*

*United States v. Beechum*, 582 F.2d 898, 914 (5th Cir.1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979) (citations omitted) (emphasis added).

In *United States v. Grassi*, 602 F.2d 1192, 1196 (5th Cir.1979), *vacated and remanded on other grounds*, 448 U.S. 902, 100 S.Ct. 3041, 65 L.Ed.2d 1131 (1980), we rejected the proposition that "the offer of a stipulation, as a matter of law, totally eviscerates the probative value of a piece of evidence relevant to the matter stipulated and thus mandates exclusion of that evidence under Rule 403." We stated,

A cold stipulation can deprive a party "of the legitimate moral force of his evidence," and can never fully substitute for tangible, physical evidence or the testimony of witnesses. In most cases, a party has the right "to present to the jury a picture of the events relied upon."

*Id.* at 1197 (citations omitted). We held in *Grassi* that "determining the weight to be given an offer to stipulate in the balancing process is committed to the sound discretion of the trial court, tempered by the particular facts presented." *Id.*

---

**5.** With regard to this evidence, the court instructed the jury in part as follows:

I have told you that you may consider evidence of flight as indicative of guilt of the accused, that is, you may consider whether that evidence has some bearing upon whether he intentionally or knowingly offered a bribe to an IRS revenue officer. You are not to consider evidence of flight in connection with the issue of entrapment or whether the accused was predisposed to commit the offense for which he is charged, which is bribery.

 Evidence of flight after an offense is not admissible to show the defendant's predisposition, nor is it relevant to the manner of the government's investigation. Thus, this evidence was not only arguably inadmissible under a Rule 403 balancing, given the threat of prejudice, it was inadmissible under Rule 401 on relevancy grounds. It simply was not relevant to any fact "of consequence to the determination of the action." Fed.R.Evid. 401. The district court abused its discretion by allowing this evidence, an error we cannot find to have been harmless.

### III.

 Finally, Kang contends that the district court erred by denying his motion to dismiss the indictment for outrageous government conduct. According to Kang, the IRS targeted him for an undercover sting operation. Normally, Kang contends, the IRS employs administrative procedures for resolving disputes over the proper characterization of workers, either as employees or contract labor. But in this instance the IRS deliberately set out to induce a bribe from Kang, though it had no reasonable basis to suspect that he was predisposed to bribe IRS officials.

 The cases on which Kang relies—*United States v. Jacobson*, 893 F.2d 999, 1002 (8th Cir.1990); and *United States v. Luttrell*, 889 F.2d 806, 812–13 (9th Cir. 1989)—both hold that the Due Process Clause requires reasonable suspicion based on articulable facts, but neither case is recognized in this circuit. Indeed, the *Jacobson* decision was overturned by the Eighth Circuit, sitting *en banc*. *United States v. Jacobson*, 916 F.2d 467 (8th Cir. 1990). As this court noted in *United States v. Kaufman*, 858 F.2d 994, 1002 (5th Cir.1988), *reh'g denied*, 874 F.2d 242 (1989), in this circuit "it is well settled that the 'outrageous government conduct' defense can only be asserted in the most outrageous circumstances.... Moreover, a defendant may not avail himself of this defense when he was an active participant in the crime at issue." In *United States v. Duvall*, 846 F.2d 966, 974 (5th Cir.1988), we made the observation that in many cases involving egregious circumstances we have found no due process violation resulting from the government's investigative conduct. In only one case has this court invoked the Due Process Clause to prohibit the government from targeting certain persons for investigation; and in that case, *United States v. Yater*, 756 F.2d 1058, 1067 (5th Cir.), *cert. denied*, 474 U.S. 901, 106 S.Ct. 225, 88 L.Ed.2d 226 (1985), the government employed a contingent fee informant and directed him to implicate specific individuals.

We find no error in the district court's refusal to dismiss the indictment. We conclude that the court abused its discretion in the challenged evidentiary rulings. Unable to find that the errors were harmless, we reverse the conviction on all counts and remand for a new trial.

REVERSED and REMANDED.