# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 5, 2025

Lyle W. Cayce
Clerk

No. 24-10687

United States of America,

*Plaintiff—Appellee*,

*versus*

Quintan Cockerell,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:18-CR-623-7

Before Stewart, Clement, and Willett, *Circuit Judges*.
Carl E. Stewart, *Circuit Judge*:

The compounding pharmacy business yields high profits. These pharmacies formulate topical creams by combining ingredients, which can result in extremely high reimbursements from insurers. Quintan Cockerell was reaping the benefits as a marketer for two such pharmacies, but he was eventually convicted for receiving illegal kickbacks as part of a conspiracy to induce physicians to prescribe highly lucrative prescriptions.

On appeal, Cockerell challenges the sufficiency of the evidence underlying his convictions, certain purported misstatements of law by the

No. 24-10687

Government during his trial, and the restitution order imposed at his sentencing. For the reasons that follow, we AFFIRM the district court's judgment.

## I

In 2013, Xpress Compounding ("Xpress") opened its doors as a compounding pharmacy that accepted federal insurance programs.[1] One of those programs was TRICARE, which covers the United States military. Xpress's overriding focus was on formulating creams that would be as lucrative as possible. Pharmacists, physicians, and marketers associated with Xpress were all involved in developing combinations of ingredients that "would bill out the highest and be the most profitable." And it worked. Between July 2014 and September 2016, TRICARE and other federal insurers paid Xpress more than $59 million in total.

Cockerell was one of Xpress's "top marketers" and was considered part of the pharmacy's "inner circle." He became extremely effective at recruiting and maintaining relationships with physicians to prescribe pain creams for Xpress to fill. He was also intimately involved in developing new formulas so that Xpress could bill insurers at increasingly high rates. He would, for example, personally seek out prescriptions for creams formulated by other compounding pharmacies to see if Xpress could make their creams as, or more, expensive.

To compensate marketers like Cockerell, Xpress paid "commissions." Marketers received a percentage of a billed prescription's revenue when the marketer influenced the physician to issue the

---

[1] Xpress had a sister company called Rxpress that handled private insurance claims. Because Rxpress did not accept federal insurance in relevant part, it is not the focus of Cockerell's convictions or his appeal.

prescription. Cockerell concealed his receipt of the commissions by having Xpress pay them in the name of his then-wife, who was supposedly an Xpress employee. But while she filled out employment paperwork for Xpress, she had no actual involvement with the pharmacy. Between August 2014 and June 2016, Cockerell's commissions totaled nearly $2.5 million.

To earn their commissions, marketers created relationships with the doctors whom they influenced to write prescriptions. As part of their outreach, they gave physicians "preload[ed]" prescription pads that had been written out in advance with the formulas that Xpress wanted them to prescribe. Marketers also provided financial and other incentives to induce physicians to send prescriptions to Xpress. Marketers, including Cockerell, showered physicians with lavish vacations and expensive dinners to encourage them to continue writing prescriptions for Xpress to fill. They also offered physicians opportunities to participate in "management service organization[s]," which allowed physicians to invest and earn back money from each prescription they wrote. Cockerell specifically used this tactic for prescriptions that were reimbursed by federal insurers like TRICARE, even though doing so is impermissible under their policies.[2] These incentives were crucial to Xpress's ability to obtain prescriptions. As one marketer later testified, "if we didn't pay the doctors, we would have had no business."

---

[2] As Scott Schuster—former co-owner of Xpress and a Government witness—testified, management service organizations and other "vehicles where doctors are invested" are permissible for "private insurance only," not for federal insurers. James Gogue—a healthcare fraud specialist who was also a Government witness—further explained that TRICARE will not pay for prescriptions if prescribing doctors are "incentiviz[ed] or giv[en] a benefit . . . to influence treating the patient." Those "benefit[s]," he explained, can "include an investment opportunity," even one in "a different pharmacy."

No. 24-10687

Some marketers, including Cockerell, also recruited other marketers, known as "sub-reps." Cockerell employed his sub-reps through a shell corporation called QSpine, and he determined what percentage of the Xpress commission the sub-rep would receive, based on the prescriptions that the sub-rep influenced. Cockerell also ensured that he received his cut. He made clear that he was entitled to an "override," or an additional percentage payable directly to him, on revenue attributed to prescriptions that his sub-reps obtained.

In 2015, Dr. Christopher Ince prescribed three topical creams to a patient ("L.L.") who was insured by TRICARE. Cockerell and Steve Bergman, one of Cockerell's sub-reps, each took a share of TRICARE's payments on those claims, with Cockerell earning a 20% "override"—a total of $1,723.53. Due in part to that transaction, Cockerell was later convicted of paying and receiving healthcare kickbacks in violation of 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute"); conspiracy to do the same in violation of 18 U.S.C. § 371; and money laundering in violation of 18 U.S.C. § 1957.[3] The district court sentenced Cockerell to 29 months of imprisonment and two years of supervised release. It also ordered him to pay $59,879,871 in restitution.

Cockerell then timely filed this appeal, in which he raises three challenges to his conviction and sentence. First, he challenges the sufficiency of the evidence underlying his convictions. Second, he challenges certain purported misstatements of the law by the Government during its closing and

---

[3] Cockerell was also charged with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) and two further counts of substantive money laundering in violation of 18 U.S.C. § 1957. The jury ultimately acquitted him of these charges, and they are not at issue in this appeal.

rebuttal arguments at trial. Third, he challenges the district court's restitution order. None of his arguments, however, merit reversal.

## II

A reasonable jury could have found Cockerell guilty, beyond a reasonable doubt, of violating the Anti-Kickback Statute, as well as conspiracy and money laundering, based on the evidence that the Government presented at trial. *See United States v. Shah*, 95 F.4th 328, 350 (5th Cir. 2024). Thus, his challenges to the sufficiency of the evidence underlying his convictions fail.

## A

"We review sufficiency of the evidence challenges de novo, but we remain 'highly deferential to the verdict.'" *Id.* (quoting *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011)). "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (cleaned up).

## B

Cockerell contends that the jury did not have sufficient evidence to convict him of violating the Anti-Kickback Statute, which criminalizes receiving a "kickback, . . . directly or indirectly, . . . in return for referring an individual to a person" for a medical treatment. 42 U.S.C. § 1320a–7b(b)(1)(A). The statute "dr[aws] a distinction . . . between . . . [the] intent to induce 'referrals,' which is illegal, and the intent to compensate advertisers, which is permissible." *United States v. Shoemaker*, 746 F.3d 614, 628 (5th Cir. 2014) (quoting *United States v. Miles*, 360 F.3d 472, 480 (5th Cir. 2004)). To prove that a defendant acted with intent to induce referrals, the Government must show that he "intended 'improperly [to] influence[]'

those who make healthcare decisions on behalf of patients." *United States v. Marchetti*, 96 F.4th 818, 827 (5th Cir. 2024) (alteration in original) (quoting *Miles*, 360 F.3d at 480). "[T]he mere fact that the good or service provider compensates the advertiser following each purchase is insufficient" to make that showing. *Shoemaker*, 746 F.3d at 628 (citing *Miles*, 360 F.3d at 480).

To establish aiding-and-abetting liability, the Government must show "that the substantive offense occurred and that the defendant (1) associated with the criminal venture; (2) purposefully participated in the crime; and (3) sought by his actions for it to succeed." *United States v. Scott*, 892 F.3d 791, 798 (5th Cir. 2018) (internal quotation marks omitted); *see also United States v. Dailey*, 868 F.3d 322, 330–31 (5th Cir. 2017) (upholding an Anti-Kickback Statute violation under an aiding-and-abetting theory). "[A] defendant need not commit each element of the substantive offense, so long as he aided and abetted each element." *Scott*, 892 F.3d at 798–99.

Cockerell argues that the Government failed to provide evidence that he or Bergman unduly influenced Dr. Ince's decisions to write L.L.'s prescription and to send it to Xpress. He states that the "override" he received from Bergman's sale was merely "compensation for introducing [] Bergman to a pharmacy." For this reason—and because the Government only put forward evidence that payments to him were routed through his then-wife, not him directly—Cockerell concludes that there was a "complete absence of any interaction between [] Cockerell and any relevant

decision[]maker in connection with" his purported violation of the Anti-Kickback Statute.[4]

We disagree. Although the Government admits that it did not show direct interactions between Cockerell and Dr. Ince, a reasonable jury could have found that Cockerell aided and abetted Bergman in his unlawful interactions. *See Scott*, 892 F.3d at 798; *see also United States v. St. Junius*, 739 F.3d 193, 210 n.18 (5th Cir. 2013). The Government demonstrated that Cockerell hired Bergman as a sub-rep and introduced him to the pharmacies. It also presented testimony and text messages showing that Cockerell personally dictated how much money Bergman was paid per prescription, directed Xpress to pay Bergman as a W–2 employee, and to pay Cockerell an "override." The Government then showed that the transaction which formed the basis of Cockerell's conviction—the payment for L.L.'s prescriptions—was consistent with this arrangement. It had a forensic accountant trace for the jury the "override" payments from Xpress to Cockerell's then-wife specifically for those prescriptions.[5] It then noted that

---

[4] Cockerell separately contends that the Government "conceded in [its] closing argument that [he] was being paid for the sales and marketing activities of [] Bergman." The Government, however, did nothing of the sort. Cockerell bases this claim on its statement that "Bergman did some of the actual marketing in this case because [] Cockerell got the money." But as the Government explains, its closing argument explicitly distinguished between "marketing" standing alone—which Cockerell's counsel also emphasized in his closing is not a crime—and "marketing" in exchange for kickbacks.

[5] It is immaterial that the payments were to Cockerell's then-wife and not to him directly. That she would fill out paperwork but had no actual involvement was evidence that Cockerell merely used her to conceal his receipt of kickbacks. As Schuster testified, Cockerell arranged for payment to his then-wife "to hide the fact that he was getting federal money." If anything, that he used his spouse as a conduit through which to receive his kickbacks was further evidence of his intent to violate the Anti-Kickback Statute. *See United States v. Strickland*, 509 F.2d 273, 276 (5th Cir. 1975) ("It is obvious that . . . concealment and falsification may reveal a consciousness of guilt and so help to carry the prosecutor's burden . . . .").

Dr. Ince "was one of only two physicians who accounted for over $800,000 in payments" to Xpress. As discussed, another marketer testified that "if [Xpress] didn't pay the doctors, [it] would have had no business." Thus, Cockerell "associated with" and "purposefully participated in" the Xpress criminal venture through actions that "sought . . . for [Xpress] to succeed." *See Scott*, 892 F.3d at 798.

The Government also presented adequate evidence that the payments were intended to improperly influence physicians to write prescriptions for Xpress to fill. *See St. Junius*, 739 F.3d at 210 n.18. True, the Government never presented evidence that Dr. Ince himself received any of the luxuries that were part of the broader conspiracy. But Schuster testified that the entire goal of the pharmacies was "making the most expensive" creams "to bill TRICARE." The Government showed that marketers would do so by providing physicians with "preload[ed]" prescription pads with profitable compounds already written out. Indeed, Bergman himself testified that he used these pads to direct physicians to check off creams to be prescribed, and that he attended "promotional dinners" for physicians. And "the record is replete with evidence that," in return, "the marketers improperly influenced physicians to write these prescriptions, including by sending them on lavish vacations."

The actions of Cockerell and his coconspirators are distinguishable from cases that lacked evidence of improper influence. In *Marchetti*, for example, we held that the Government must show more than just evidence that a defendant was compensated for referrals as a percentage of revenue generated. 96 F.4th at 831. As we explained, there was no evidence that the *Marchetti* defendant impermissibly influenced "those who make healthcare decisions on behalf of patients." *Id.* at 827. Similarly, in *Miles* we overturned an Anti-Kickback Statute conviction when a public relations firm "supplied promotional materials to . . . doctors" and occasionally "plates of cookies to

No. 24-10687

doctors' offices." 360 F.3d at 479–80. Critically, these actions did not prevent physicians from independently choosing whether to authorize care and which provider would be best for their patients. *See id.* at 480–81. Unlike the Government's evidence of marketing alone in *Marchetti*, and unlike occasional plates of cookies in *Miles*, Cockerell's lavish vacations and offerings of investment in management service organizations are evidence of such impermissible influence and affirmative inducement.[6]

In sum, the jury could reasonably have found knowing and willful solicitation and remuneration in return for referring or recommending the purchasing or ordering of compounded creams. *See* 42 U.S.C. § 1320a-7b(b)(1)(A)–(B); *St. Junius*, 739 F.3d at 210 n.18; *Shah*, 95 F.4th at 350.

## C

Cockerell also urges us to hold that the jury did not have sufficient evidence to convict him of conspiracy under 18 U.S.C. § 371 or money laundering under 18 U.S.C. § 1957. Section 371 requires the Government to

---

[6] The Seventh Circuit recently adopted the same distinction. In *United States v. Sorenson*, advertisers published public advertisements for orthopedic braces. 134 F.4th 493, 496–97 (7th Cir. 2025). Patients could contact them via electronic forms for additional information, and with the patient's consent, the company's sales agents faxed "prefilled but unsigned prescription forms to patients' physicians." The physicians who received the prescription forms then decided whether to sign or ignore them. If a physician chose to sign the prescription form, the company shipped the braces and billed Medicare. Of the funds collected, the company distributed 79% to the manufacturer and kept 21% as a service fee. Out of the 79%, the manufacturer paid the advertising firms "based on the number of leads . . . generated." *Id.* The Seventh Circuit reversed the defendant's conviction under the Anti-Kickback Statute because "there simply [was] no evidence that the entities [the defendant] paid . . . leveraged any sort of informal power and influence over healthcare decisions." *Id.* at 501.

Unlike the advertising in *Sorenson*, which involved truly public advertisements and patient consent, Cockerell's "marketing" affirmatively induced physicians without patient involvement. *See id.*

show "(1) an agreement between two or more people to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the conspirators in furtherance of the conspiracy's objective." *United States v. Plezia*, 115 F.4th 379, 390 (5th Cir. 2024) (internal citation omitted). Section 1957 requires that it show "(1) property valued at more than $10,000 that was derived from a specified unlawful activity, (2) the defendant's engagement in a financial transaction with the property, and (3) the defendant's knowledge that the property was derived from unlawful activity." *United States v. Davis*, 53 F.4th 833, 843 (5th Cir. 2022) (internal quotation omitted).

Cockerell contends that reversal of his conspiracy and money-laundering convictions must follow as a necessary consequence of reversing his conviction under the Anti-Kickback Statute. For conspiracy, he reasons that the sole "overt act" that the Government mentioned in its indictment was that he violated the Anti-Kickback Statute. Thus, he concludes that a conviction under that count "became an element of" the conspiracy charge that the Government was required to prove. For money laundering, Cockerell similarly reasons that the only "unlawful activity" that the Government "specified" was his Anti-Kickback Statute and conspiracy convictions.

Cockerell's arguments depend entirely on us first reversing his conviction under the Anti-Kickback Statute. Because he provides us no basis to do so, he necessarily provides us none to reverse his conspiracy and money-laundering convictions. *See Shah*, 95 F.4th at 350.

## III

Cockerell also challenges certain purported misstatements of law from the Government in its closing and rebuttal arguments. Because he has failed

to point to any statement that sufficiently prejudiced the outcome of his trial, he has not shown reversible error. *See United States v. Lowenberg*, 853 F.2d 295, 301 (5th Cir. 1988).

## A

We review preserved claims that prosecutors made improper remarks during closing arguments for abuse of discretion, subject to harmless-error review. *See United States v. Kang*, 934 F.2d 621, 627 (5th Cir. 1991). We review unpreserved claims for plain error. *See United States v. Vargas*, 580 F.3d 274, 278 (5th Cir. 2009). Plain error generally requires (1) an error (2) that was clear or obvious and (3) that affected the defendant's substantial rights, and (4) this court will exercise its discretion to remedy the error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See United States v. Escalante-Reyes*, 689 F.3d 415, 419 (5th Cir. 2012) (en banc). More specifically, a prosecutor's comments only constitute plain error if they are "inappropriate and harmful." *Lowenberg*, 853 F.2d at 301 (internal quotation marks and citation omitted). To determine whether that is the case, we consider (1) "the magnitude of the prejudicial effect of the statements"; (2) "the efficacy of any cautionary instruction"; and (3) "the strength of the evidence of the defendant's guilt." *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989) (per curiam).

## B

Cockerell takes issue with five statements from the Government. He only preserved his challenge, however, to one by objecting at trial. *See Vargas*, 580 F.3d at 278. We consider each in turn.

## 1

Starting with Cockerell's preserved challenge, he contends that the Government "asked the jurors to improperly and erroneously infer that,

unless the sales and marketing professional is protected by a *voluntary* safe-harbor known as the employee safe-harbor, they must be guilty of the crime of violating the [] Anti-Kickback statute." Specifically, he points to the following Government statement:

> [T]he defense says that there's no law against marketing. Boy, that is misleading. He's right. There isn't a law against marketing. But there is a law against getting paid kickbacks for marketing. Yeah. Medical companies need marketers, and they can pay them. There's an exception for how. They have to be a bona fide employee.

Cockerell states that, "if you do not fall into a voluntary employee safe harbor," you do not necessarily violate the Anti-Kickback Statute just because "you obtain compensation for marketing or recommending a product." *See Marchetti*, 96 F.4th at 826–27 & n.6. The Government would instead need to show "undue influence" over the physicians recommending the products. *See id.* at 827.

Cockerell has shown no error—let alone an abuse of discretion—from the Government's statement mentioning the bona fide employee exception. *See United States v. Griffin*, 324 F.3d 330, 361 (5th Cir. 2003). The Government correctly stated that an exception to the Anti-Kickback Statute exists for bona fide employees. 42 U.S.C. § 1320a-7b(b)(3)(B) (excepting from the Anti-Kickback Statute "any amount paid by an employer to an employee . . ."). The statement even draws the exact distinction between mere marketing and marketing for kickbacks that Cockerell claims the Government elided in the other four statements at issue.

Even if the statement were erroneous, it was harmless. *See Kang*, 934 F.2d at 627. The district court promptly offered a cautionary instruction to the jury to heed only the jury charge. The instruction mirrored similar ones the district court had offered at the start of trial, as part of its final

No. 24-10687

instructions, before the Government's closing argument, and during Cockerell's closing argument. These repeated admonitions "mitigate any prejudicial effect" of the Government's statements. *United States v. Bennett*, 874 F.3d 236, 255 (5th Cir. 2017).

For these reasons, Cockerell has failed to show the district court abused its discretion or that the error was not harmless. *See Griffin*, 324 F.3d at 361.

**2**

Moving on to Cockerell's unpreserved challenges, he argues that "the [G]overnment repeatedly misstated the law and told the jurors that the precise type of marketing that *Marchetti* and *Miles* expressly permit is a crime under the [] Anti-Kickback statute." *See* 96 F.4th at 827; 360 F.3d at 480). Specifically, he points to four statements from the Government:

> (1) . . . this remuneration, this money, was in exchange for referring or promoting, that is, recommending the ordering of a product or service that is reimbursed by federal insurance, TRICARE. And that's exactly what Quintan Cockerell did here. . . . He was marketing. He was recommending the specific products that these doctors were prescribing. . . .
>
> (2) [I]t doesn't matter that Adam [*sic*] Bergman did some of the actual marketing in this case because Quintan Cockerell got the money. In addition, he aided and abetted Bergman by introducing him to the pharmacy, bringing him in, [and] dictating the breakdown of his commission payments and how that worked.
>
> (3) [A]nd because they deliberately failed to meet the [bona fide employee] exception, they're left with the rule, and that is this: You can't pay people to recommend a TRICARE product as an inducement.

    (4) That is recommending a product for the ordering—
that's recommending the ordering of a product. And that
is what you're not allowed to get a kickback to do, but he
took one anyway.

Cockerell contends that these "were incorrect statements of the law"
because "[t]he Fifth Circuit has never held that recommending a product is
a violation of" the Anti-Kickback Statute.

Cockerell then homes in on the second statement. He argues that it
was "misleading and irrelevant" for the Government to "assert[] that [he]
dictated the breakdown of [Bergman's] commission." Relying on *Marchetti*,
96 F.4th at 827, he posits "that the structure of the contracts—and the
payments contemplated in those contracts (activity, commission based[,]
etc.)—cannot support an [Anti-Kickback Statute] conviction."

For prejudice, Cockerell argues that the Government's
"misstatements of the law were not isolated[,] and they prejudiced the
outcome of [his] trial and substantially influenced the jurors' verdicts"
finding him guilty. He reasons that each guilty verdict was "inextricably
intertwined [with] whether [he] was guilty of a violation of the federal Anti-
Kickback statute." In turn, he states that the "override" payment he
received from Bergman was for "introducing him" to Xpress, "[n]ot for
referrals," "for unduly influencing Dr. Ince," or "for having any connection
to the relevant decision[]maker." Cockerell also contends that "when
considered as a whole," the Government's "continuous" misstatements of
law "amply demonstrate that the jurors reached a verdict based on" a "side
show." Thus, he posits that their deliberations likely neglected the main act:
whether the payments to Cockerell were "in return for exercising undue

influence over patient[s'] selection of health care services." *See Marchetti*, 96 F.4th at 824–27.[7]

We disagree. Cockerell's arguments do not establish plain error in any of the four statements at issue. Even if they were potentially misleading, their "prejudicial effect . . . was minimal." *See United States v. Greenlaw*, 84 F.4th 325, 359 (5th Cir. 2023); *see also Lowenberg*, 853 F.2d at 301; *see also Iredia*, 866 F.2d at 117. Elsewhere in the Government's closing argument, it explicitly distinguished between "marketing" standing alone, which Cockerell's counsel emphasized in his closing is not a crime, and "marketing" in exchange for kickbacks. It consistently emphasized the same throughout trial. The district court also instructed the jury against any potential misimpression that mere "marketing" was a crime. Those instructions mitigated the prejudicial effect of any misimpression created by the statements that Cockerell challenges. *See Marchetti*, 96 F.4th at 831 (stating in response to a challenge to materially identical jury instructions that "they are quite clear that the payments have to be made in order to induce an unlawful referral"); *Greenlaw*, 84 F.4th at 359 (holding that the prejudicial effect of a prosecutor's comments "was minimal" in part because of district court's accurate jury instructions).

Additionally, the Government put forward a substantial set of evidence establishing Cockerell's intent to influence physicians' prescription choices through sub-reps like Bergman. As we have held multiple times before, "substantial evidence pointing to [] guilt" counsels against prejudice

---

[7] In Cockerell's reply brief, he states that he "preserves each of his arguments from his opening brief related to closing argument." This appears to be an attempt to preserve the arguments from forfeiture on appeal, not a contention that he raised the objections at trial such that they are reviewed for an abuse of discretion instead of plain error. *See Griffin*, 324 F.3d at 361.

for reversible error. *See United States v. Ramirez-Velasquez*, 322 F.3d 868, 875 (5th Cir. 2003); *see also Bennett*, 874 F.3d at 255–56; *United States v. Loeffel*, 172 F. App'x 612, 617–18 (5th Cir. 2006) (per curiam). Thus, the district court did not plainly err with respect to the Government's statements. *See Iredia*, 866 F.2d at 117.

## IV

Lastly, Cockerell contends that the district court's restitution order ran afoul of the Mandatory Victims Restitution Act (the "MVRA"). *See* 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). We review the legality of a restitution order de novo and its amount for abuse of discretion. *United States v. King*, 93 F.4th 845, 850 (5th Cir. 2024). Cockerell raises both types of challenges. Neither, however, persuades that the district court erred.

## A

The MVRA mandates restitution for defendants convicted of "an offense against property under this title, . . . including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). It defines a "victim" as

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

*Id.* § 3663A(a)(2). "Under the MVRA, members of a conspiracy may be held jointly and severally liable for all foreseeable losses within the scope of their conspiracy regardless of whether a specific loss is attributable to a particular conspirator." *King*, 93 F.4th at 854 (internal quotation marks omitted); *see also United States v. Shelton*, 694 F. App'x 220, 223–24 (5th Cir. 2017) (per

curiam) (holding that a defendant's argument to the contrary "is foreclosed by our precedent" and collecting cases from other circuits holding the same).

Cockerell contends that the district court's order is legally invalid because the district court neither held a "restitution hearing" nor "introduced [] witnesses or exhibits."

Cockerell's reasoning does not withstand scrutiny. He was able to raise his arguments and evidence both at his sentencing hearing and in his objections to the presentence investigation report addendum. It is unclear what further opportunity Cockerell lacked to defend against the award. *See United States v. Loe*, 248 F.3d 449, 470 (5th Cir. 2001) (affirming the denial of restitution offsets where the defendant was unable to provide reliable evidence supporting her claims); *cf. United States v. Sharma*, 609 F. App'x 797, 803–04 (5th Cir. 2015) (per curiam) (same where the defendant raised a due process challenge because he was unaware of his burden when developing the record at initial sentencing). Thus, the district court's restitution order is legally valid. *See King*, 93 F.4th at 850.

**B**

"The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government[,]" and "[t]he burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires." 18 U.S.C. § 3664(e). "We have interpreted these two statutory sentences to establish a burden-shifting framework for loss-amount calculations. The Government first must carry its burden of demonstrating the actual loss . . . by a preponderance of the evidence. Then the defendant can rebut the Government's evidence." *United States v. Williams*, 993 F.3d 976, 980–81 (5th Cir. 2021) (internal citations omitted).

"When the exact amount of actual loss is not clear, the district court is permitted to make reasonable estimates supported by the record." *King*, 93 F.4th at 851. "Actual loss for restitution purposes is offset by the amount of the legitimate services provided to the patients in healthcare fraud cases." *Id.* To receive such an offset, however, a defendant must provide evidence suggesting that legitimate medical services were provided. *See, e.g.*, *United States v. Ricard*, 922 F.3d 639, 659 (5th Cir. 2019) ("point[ing] to trial testimony suggesting" that patients were "provided actual treatment"). "In the absence of evidence from the defendant, the district court may reasonably treat the entire claim for benefits as intended loss." *United States v. Mazkouri*, 945 F.3d 293, 304 (5th Cir. 2019) (internal quotation omitted).

Cockerell argues that the district court "improperly shifted the entire burden of offsetting the loss to [him] without first demanding that the [G]overnment prove beyond a preponderance of the evidence that the loss amount was $59,879,871.00." *See* 18 U.S.C. § 3663A(e) ("The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."). As support for this argument, he focuses on the district court's reasoning for shifting the burden to him: that the fraud was "so pervasive that separating legitimate fraudulent conduct is not reasonabl[y] practicable." *Mazkouri*, 945 F.3d at 304; *see King*, 93 F.3d at 854. Cockerell contends that the district court's reliance on this caselaw is misplaced. He posits that both cases relate to schemes "targeting vulnerable patients" who received "intensive, daily treatment" such that the schemes were "permeated with fraud to the extent that no one could segregate legitimate versus illegitimate services." *See Mazkouri*, 945 F.3d at 304; *United States v. Diggs*, 93 F.4th 845, 854 (5th Cir. 2024). Cockerell says that "the pervasiveness of the fraud analysis was critical to the court's calculation of *intended loss*" in those cases. Here, by contrast, he asserts—

without evidence—that Xpress's compounded medications "were not inherently illegitimate."

We require more to "show[] that particular [payments] are legitimate." *See Mazkouri*, 945 F.3d at 304 (internal quotation omitted). In *Ricard*, for example, we vacated and remanded a restitution award of $1.958 million. 922 F.3d at 658–60. Although the Government met its initial burden by pointing to Medicare billing data and "Medicare's rule that it does not pay for services procured through kickbacks," the defendant in *Ricard* provided evidence to offset the actual loss amount: trial testimony that actual treatment was provided to patients. *Id.* at 659. The Government did not rebut the defendant in *Ricard*'s evidence with any allegation that the treatment was "illusory or medically unnecessary." *Id.* Additionally, the record suggested Medicare would have paid for the services if not for the kickback scheme. *Id.*

On the other hand, in *King* we upheld a $537,992.55 restitution award under similar circumstances to those underlying this case. 93 F.4th at 853–54. There, the Government introduced evidence that Medicare paid a clinic the award amount for claims related to the residents of the defendants' group homes. It also demonstrated that the medical services were fraudulent. *Id.* In response, the defendants "failed to show that any of the billed medical care was legitimate, and thus did not show that the total billed to Medicare was subject to an offset." *Id.* at 854.

True, like in *Ricard,* the Government here presented evidence that federal payers would not have paid for prescriptions had they known that physicians had been provided with incentives. But unlike in that case, the Government here put forward evidence that the compounded creams were not tailored to patient need or necessity. And once the Government presented the total loss amount, the district court concluded that the fraud was so pervasive that "separating legitimate [from] fraudulent conduct [wa]s

not reasonabl[y] practicable." Thus, the district court was permitted "to make reasonable estimates supported by the record" and shift the burden to Cockerell to offset that estimate. *See King*, 93 F.4th at 851; *see also Mazkouri*, 945 F.3d at 304 ("When fraud is so pervasive that separating legitimate from fraudulent conduct 'is not reasonably practicable,' 'the burden shifts to the defendant to make a showing that particular amounts are legitimate.'" (citation omitted)).

More importantly, like the defendant in *King*, Cockerell failed to present any evidence that any prescription for the compounded cream was legitimate. Indeed, Cockerell acknowledged that any legitimate amounts "ha[d] not been separated out." Now, he merely asserts—without supporting factual or legal authority—that "the services here were not inherently illegitimate" and blames the Government for never calling patients to testify. Moreover, Cockerell misconstrues the record and argues that the district court "seemed to even concede that there were some legitimate services[,] but segregating illegitimate from legitimate would not be practical." The district court, however, disagreed with Cockerell on this point and merely stated that there was evidence of *illegitimate* prescriptions. It then reminded Cockerell of his burden to "show that particular amounts are legitimate." He did not do so.

In sum, the district court properly acted within its discretion by not offsetting the restitution award. *See King*, 93 F.4th at 850.

## V

For the foregoing reasons, we AFFIRM the district court's judgment.